JAMES R. WILLIAMS, County Counsel (SBN 271253)
GRETA S. HANSEN (SBN 251471)
LAURA S. TRICE (SBN 284837)
MARCELO QUIÑONES (SBN 279132)
OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
70 West Hedding Street
East Wing, Ninth Floor
San Jose, CA 95110-1770
Telephone:  (408) 299-5900
Facsimile:  (408) 292-7240
laura.trice@cco.sccgov.org
marcelo.quinones@cco.sccgov.org

*Attorneys for Plaintiff County of Santa Clara*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Telephone:  (415) 421-7151
Facsimile:  (415) 362-8064
jweissglass@altber.com
sleyton@altber.com
ebrown@altber.com

*Attorneys for all Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *in his official capacity as President of the United States*; JEFFERSON BEAUREGARD SESSIONS, *in his official capacity as Attorney General of the United States*; and ELAINE DUKE, *in her official capacity as Acting Secretary of the Department of Homeland Security*; and U. S. DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      Plaintiffs County of Santa Clara ("County") and Service Employees International Union Local 521 ("Local 521"), acting in its capacity as the representative of more than 10,000 County employees, challenge the actions of Defendants President Donald J. Trump, Attorney General Jefferson Beauregard Sessions, and Acting Department of Homeland Security ("DHS") Secretary Elaine Duke related to the rescission of the Deferred Action for Childhood Arrivals ("DACA") program.  DACA affords a two-year period of "deferred action" status for young people who were brought to this country as children, meaning that recipients are not subject to immigration enforcement actions during that time.  Recipients are also afforded the opportunity to receive work authorization, allowing them to work legally, report income, and pay taxes.  Because of DACA, approximately 800,000 young people, brought to this country as children, have been able to come out of the shadows of American life, work legally to support themselves and their families, go to school, pay taxes, and participate more fully in their communities.  The DACA program has been hugely successful.  But the benefits the program provided communities locally and nationally are now at risk, as are the futures of DACA recipients.

2.      Because of the stringent requirements governing eligibility for the DACA program from its inception, DACA recipients are undeniably contributing members of society who pose no threat to public safety or national security.  These individuals find themselves on the wrong side of America's immigration laws through no fault of their own, and have made substantial contributions to their communities despite the constant threat of removal they faced prior to receiving DACA status.

3.      DACA has conferred innumerable benefits on recipients, their families, and their communities.  DACA recipients can live their lives in the open and more fully participate in civic life, including by working legally, attending college (and receiving financial aid to do so), opening bank accounts, paying taxes, and living free of the daily fear of deportation.  The families of DACA recipients benefit from the higher wages many recipients are able to earn and the stability of knowing that loved ones will not be separated.  The communities in which DACA recipients live benefit not only from the taxes paid by recipients as they work legally and report income, but also

1  from DACA recipients' increased willingness to interact with government institutions, such as by

2  contacting and cooperating with law enforcement.

3       4.    To induce individuals to apply for DACA, the federal government assured potential

4  applicants that the information they provided in connection with the program would not be used for

5  immigration enforcement.  These representations, made consistently throughout the life of the

6  DACA program, were crucial to encouraging participation.  The government asked DACA

7  applicants to take a leap of faith in identifying themselves and, indirectly, their families, to the very

8  government agency that possesses the authority to detain them and ultimately to deport them from

9  the country.  DACA applicants were asked to provide information concerning, among other things,

10  their names, addresses, places of birth, dates of entry to the United States, and any criminal histories.

11  Because of the huge risk undertaken by DACA applicants in providing this information to the

12  federal government, most were willing to do so only in reliance on the government's repeated

13  assurances that this information would not be used for immigration enforcement purposes.

14       5.    The DACA program also provided recipients the opportunity to renew their deferred

15  action status at the end of each two-year period for which status is granted.  From the time that

16  DACA was implemented until Defendants' recent actions, the federal government has consistently

17  assured DACA applicants that they will remain eligible for renewed status and work authorization as

18  long as they comply with all of the conditions of the program.  This opportunity to renew is a critical

19  aspect of the program because it would make little sense for individuals to risk coming forward to

20  identify themselves as lacking regular immigration status in exchange for a temporary benefit.

21  Similarly, it would make little sense for employers, like the County, to expend the time and

22  resources to hire and train DACA recipients if their work authorization were so limited.

23       6.    Despite the program's extensive benefits, on September 5, 2017, Acting Secretary

24  Duke issued a memorandum formally rescinding DACA.  The memorandum stated that DHS would

25  not consider any initial DACA applications received after September 5, 2017 and explained that

26  those individuals who currently have DACA status and work authorization would no longer be able

27  to renew that status after October 5, 2017.  Unlike the administrative actions creating the DACA

28  program, which afforded officials significant discretion to decide on a case-by-case basis when it is

1    appropriate to grant deferred action status and work authorization, the policy announced by Acting

2    Secretary Duke's September 5 memorandum is categorical – the DACA program is discontinued and

3    no individual, no matter how deserving, will be able to apply for deferred action and work

4    authorization pursuant to DACA.  Acting Secretary Duke's memorandum did not explain the

5    administration's reasons for rescinding DACA (other than to speculate that it may be held unlawful,

6    despite the federal government's previous position to the contrary), and gave no indication that the

7    administration had considered the benefits of the program before ending it so abruptly.

8         7.    Defendants' actions in rescinding the DACA program are unlawful.  First, they

9    violate the Due Process Clause of the Fifth Amendment because they deprive Plaintiffs of

10   constitutionally protected interests, including Plaintiffs' interests in their mutual employment

11   agreements and DACA recipients' interest in the continuation of the DACA program, upon which

12   they have been induced to rely.  Indeed, the DACA program permitted recipients to work legally, to

13   participate in other government programs, to open bank accounts, and to participate in civic life in

14   myriad ways which will now be unavailable to them.  Each of these activities gives rise to an interest

15   protected by the Due Process Clause.  Yet, deprivation of these interests has been accomplished

16   without the due process required by law.  Moreover, insofar as the government uses the information

17   provided by DACA applicants for immigration enforcement purposes – and having broken one

18   promise, there is no reason to believe that Defendants intend to keep this subsidiary promise – such

19   use will independently violate the Due Process Clause.  Under the Due Process Clause the

20   government may not induce vulnerable individuals to share information to obtain a benefit with the

21   promise that such information will not be used against them, only to turn around and use that

22   information against them.  Immigration enforcement, like all government law enforcement, must be

23   fundamentally fair.

24        8.    Second, Defendants' actions violate the Administrative Procedure Act ("APA"), 5

25   U.S.C. §706(2)(A), because they constitute arbitrary and capricious decision-making.  Indeed, this

26   case presents an archetypal example of arbitrary decision-making in that Defendants have terminated

27   a program implemented five years ago, and upon which millions of Americans (DACA recipients,

28   their families, and employers) have come to rely, with no explanation whatsoever for the abrupt

about-face, much less the type of careful analysis one would expect before such a consequential action is taken.  The APA requires that administrative agencies provide a reasoned explanation for their actions, and this obligation is especially important where the agency action in question reverses a prior policy that has engendered reliance by affected parties.  Defendants' total disregard for Plaintiffs' and similarly situated parties' reliance on the DACA program is evident in their failure to provide any reasoned explanation for the rescission that takes into account the program's benefits.

9.      Third, Defendants' actions violate the Equal Protection component of the Fifth Amendment.  The Fifth Amendment requires that the federal government afford all individuals equal protection of the laws and refrain from discriminating against disfavored classes.  In this case, it is inarguable that the rescission of DACA falls most heavily on two historically persecuted minorities, Latinos and Mexican immigrants.  Indeed, 93% of the approved DACA applications (initial and renewal) since the program was implemented are from immigrants from Latin America and almost 80% are from immigrants from Mexico.  Moreover, there is extensive evidence, not least of which are the President's own statements, that the rescission was motivated by impermissible animus.  Two years ago, the President launched his campaign by announcing:  "When Mexico sends its people, they're not sending their best. . . .  They're sending people that have lots of problems, and they're bring those problems with us [sic].  They're bringing drugs.  They're bringing crime.  They're rapists."  This hostility toward immigrants, and particularly Mexican immigrants, remained a theme throughout his campaign and the first months of his administration.  Coupled with the lack of a legitimate explanation for the rescission and the irregular (and unlawful) process by which the rescission was accomplished, the President's repeated statements of animus show that the rescission was motivated by animus in violation of the Fifth Amendment.

10.     For all of these reasons, Plaintiffs ask this Court to declare the rescission of DACA unlawful and unenforceable, and to enjoin and restrain Defendants from taking further steps to rescind the program.  Further, the Court should declare that Defendants are equitably estopped from rescinding the program or using information provided in connection with DACA applications for purposes of immigration enforcement, and should enjoin and restrain Defendants from doing so.

The DACA program has worked to the benefit of DACA recipients, their employers, local communities, and American society as a whole. All of these stakeholders deserve better.

## JURISDICTION AND VENUE

11. This Court has jurisdiction pursuant to 28 U.S.C. §§1331, 1361, and 2201-2202, because this action arises under the Due Process Clause and Equal Protection component of the Fifth Amendment and the Administrative Procedure Act, 5 U.S.C. §551 *et seq.* This Court has additional remedial authority under the APA, 5 U.S.C. §§701-06.

12. There exists an actual and justiciable controversy between Plaintiffs and Defendants requiring resolution by this Court. Plaintiffs have no adequate remedy at law.

13. Venue is proper in the Northern District of California because Plaintiff County of Santa Clara is a public entity in this judicial district and a substantial part of the events or omissions giving rise to this action have occurred or will occur in this District. 28 U.S.C. §§1391(b)(2), 1391(e)(1). Plaintiff Local 521 is located in the Northern District of California and many of its members, on behalf of whom it brings this lawsuit, reside and are employed within the Northern District of California. This is a civil action in which Defendants are agencies of the United States or officers thereof and no real property is involved in this action.

14. Intra-district assignment is proper in San Jose pursuant to Local Rules 3-2(c) and (e) because a substantial part of the events or omissions which give rise to Plaintiffs' claims occurred in Santa Clara County.

## PARTIES

15. Plaintiff County of Santa Clara is a charter county organized and existing under the laws of the State of California. With an estimated population of more than 1.9 million people, Santa Clara County is the largest county in the Bay Area and the sixth largest county in California. As a county of immigrants, the County has especially benefited from DACA and is especially harmed by the program's rescission. Thirty-eight percent of Santa Clara County residents are foreign born, and approximately sixty percent of children in the county have at least one parent who is foreign born. Santa Clara County has the highest percentage of foreign-born residents of all counties in California.

More than half of county residents speak a language other than English at home, and more than 100 languages and dialects are spoken within the county.

16.     The County is the level of government tasked with provision of core safety-net services to this diverse community; it employs a workforce of more than 18,000, and must ensure that this workforce possesses the skills necessary to effectively serve this community.  The County employs DACA recipients in key positions throughout the organization, providing upward mobility to young people who deserve the opportunity to serve their communities through the public sector, and leveraging the unique experience and skills these employees bring to the County government.

17.     The County also operates the In-Home Supportive Services ("IHSS") program, which provides in-home care in the form of assistance with activities of daily living, to eligible aged, blind, and disabled individuals who would otherwise be unable to remain safely in their own homes.  The IHSS program is funded through a combination of federal, state, and county funds, and provides services to over 22,000 IHSS beneficiaries in Santa Clara County.

18.     Plaintiff Service Employees International Union Local 521 is a labor union that represents approximately 40,000 public- and private-sector workers in the central Bay Area and California's Central Valley, including more than 10,000 who are employed by the County of Santa Clara.  Local 521 is an affiliate of the Service Employees International Union ("SEIU"), which represents 2.2 million working men and women around the world.  A large percentage of Local 521's membership is Latino and many are first-generation immigrants.  The primary mission of Local 521 is to organize, represent, and empower employees.

19.     In addition, Local 521 works in partnership with SEIU and other groups to combat discrimination and mobilize for immigration reform at the national level.  Local 521's efforts include its Committee on Comprehensive Immigration Reform, a member-based committee that engages in organizing, advocacy, and education to help undocumented workers.  Local 521 has conducted "know your rights" information sessions and workshops, engaged in legislative advocacy on immigration-related bills at the state level, held community forums on DACA and Deferred Action for Parents of Americans and Lawful Permanent Residents in conjunction with the California Attorney General, and participated as an amicus in litigation brought by the County of Santa Clara

1   and others challenging the Trump administration's threat to cut off federal funding to sanctuary cities

2   and counties.  Local 521 has members who are DACA recipients, including members who work for

3   the County of Santa Clara.  These members are able to work and, thus, to be Local 521 members,

4   because of the work authorization they obtain through the DACA program.

5          20.     Local 521 brings this action as an associational plaintiff on behalf of its members who

6   are DACA recipients, asserting claims on behalf of those members.  Local 521 also brings this

7   lawsuit to protect the rights and interests of its members and prospective members, to preserve its

8   ability to organize new members who are DACA recipients, and to preserve its representational

9   relationship with current DACA recipients.

10         21.     Defendant Donald J. Trump is the President of the United States.  President Trump

11   made the decision to rescind the DACA program and is sued in his official capacity.

12         22.     Defendant Jefferson Beauregard Sessions is the Attorney General of the United

13   States.  Attorney General Sessions announced the rescission of the DACA program and has ultimate

14   authority over the Department of Justice's prosecution of violations of immigration laws.  He is sued

15   in his official capacity.

16         23.     Defendant Elaine Duke is the Acting Secretary of the Department of Homeland

17   Security ("DHS").  Acting Secretary Duke is responsible for managing DHS, and oversees the

18   United States Citizenship and Immigration Service ("USCIS") and the Immigration and Customs

19   Enforcement ("ICE").  Her responsibilities include the administration and enforcement of policies

20   and practices related to DACA.  She is sued in her official capacity.

21         24.     Defendant DHS is a federal agency responsible for implementing, administering and

22   enforcing the nation's immigration laws and policies, including the DACA program.  DHS is a

23   Department of the Executive Branch and is an agency within the meaning of 5 U.S.C. §552(f)(1).

24                              **FACTUAL BACKGROUND**

25   **The DACA Program**

26         25.     DHS announced the DACA program in 2012, in a memorandum issued by former

27   DHS Secretary Janet Napolitano.  The reasoning behind the program was that it made no sense to

28   punish individuals who were brought to the United States as children, through no fault of their own,

and who had proven themselves to be trustworthy, contributing members of their communities.
DACA was also intended to generate the wide-reaching benefits that would accrue to recipients, their
families and their communities, as undocumented individuals were permitted to live and work
without the ever-present threat of deportation.

26.     DACA allows people who were brought to the United States as children and who
meet certain criteria to apply for temporary deferral of deportation (sometimes referred to as
"deferred action") and for work authorization.  According to USCIS, as of March 31, 2017,
approximately 800,000 young people have been granted deferred action under DACA in the five
years the program has been in place.  Applicants are eligible for deferred action status under DACA
only if they: (i) were under the age of 31 on June 15, 2012; (ii) were brought to the United States
before their 16th birthday; (iii) continuously resided in the United States since June 15, 2007 to the
present; (iv) were physically present in the United States on June 15, 2012, and at the time they made
their DACA application; (v) did not have lawful immigration status on June 15, 2012; (vi) are
currently in school, have graduated or obtained a GED, or were honorably discharged from the
United States military or Coast Guard; and (vii) have not been convicted of a felony, significant
misdemeanor, or three or more misdemeanors, and do not pose a threat to national security or public
safety.

27.     To apply for deferred action status under DACA, applicants are required to pay a
substantial fee of $495, submit a detailed application, and submit to a background check and any
other screening that DHS deems necessary.

28.     Pursuant to DACA, deferred action status, as well as work authorization, is granted
for two-year periods.  From the time DACA was first implemented, however, applicants were told
that they would have the opportunity to apply for renewal of deferred action status and were given
detailed instructions for doing so.  In particular, recipients were instructed that they should apply for
renewal approximately 120 days (but no more than 150 days) before the expiration of their 2-year
period.  Recipients were told that they would be eligible for renewal if they met the requirements for
an initial DACA application and also: (i) had not departed the United States on or after June 15,
2007; (ii) continuously resided in the United States since submission of their most recent DACA

1  application; and (iii) had not in the interim been convicted of a disqualifying crime or otherwise

2  posed a threat to national security or public safety.  The opportunity to renew is a crucial aspect of

3  the DACA program.  There is little reason for eligible individuals to run the risk of identifying

4  themselves as lacking regular immigration status for a temporary benefit and, similarly, there is little

5  reason for employers to take the time and effort to hire and train DACA recipients who have

6  received work authorization unless there is some assurance that those individuals will be eligible to

7  renew that authorization.

8      29.     As part of the DACA application process, Defendants solicited extensive information

9  from DACA recipients, including names, addresses, birthdates, country of origin, and educational

10 and criminal history.  Most significantly, by issuing an open invitation to apply for DACA, the

11 government asked undocumented immigrants to take a leap of faith and identify themselves and,

12 indirectly, their families to the federal government and acknowledge their undocumented status.  To

13 assuage fears that the DACA program was a cynical trap, Defendants expressly promised that the

14 information provided by DACA applicants would not be used against them or their families for

15 immigration enforcement purposes, except in narrow, specified circumstances that would not

16 normally apply to individuals eligible for DACA.

17      30.     The DACA program has been tremendously successful, creating much-needed

18 stability for DACA recipients, their families and their communities, which has resulted in extensive

19 benefits to all of those groups.  Under DACA, law-abiding, long-term U.S. residents who lack legal

20 immigration status have access to better jobs and improved working conditions.  Because

21 undocumented immigrants who lack work authorization must seek jobs that minimize their risk of

22 being identified and deported, they often do not work in jobs that best fit their education, skills, and

23 abilities, or those that would maximize their earning potential.  Patrick Oakford, Center for

24 American Progress, *Administrative Action on Immigration Reform, The Fiscal Benefits of Temporary*

25 *Work Permits*, at 6 (September 2014), available at: https://cdn.americanprogress.org/wp-

26 content/uploads/2014/09/OakfordAdminRelief.pdf (last visited Oct. 9, 2017).  Making workers

27 eligible to apply for deferred action and work permits allows them greater occupational mobility,

28 enabling them to seek out a wider range of potential career opportunities.  Moreover, "[t]he

1  interaction between our broken immigration system and employment and labor laws have made

2  undocumented workers more susceptible to exploitation in the workplace, leading them to earn lower

3  wages than they otherwise could." *Id.* at 5.  Eliminating the fear of retaliatory reporting of

4  immigration violations and potential deportation allows these workers to better protect their own

5  workplace rights and those of their co-workers, leading to higher real wages and fewer violations of

6  employment and labor laws and regulations.

7        31.    Those who have received DACA status enjoy increased earning potential, producing a

8  positive multiplier effect on local economies.  Fiscal Policy Institute, *President's Immigration Action*

9  *Expected to Benefit Economy* (Nov. 21, 2014), available at: http://bit.ly/1FbnS7q (last visited Oct. 9,

10  2017) (estimating that wages for those eligible for work authorization will increase by five to 10

11  percent); Oakford, *Administrative Action on Immigration Reform, The Fiscal Benefits of Temporary*

12  *Work Permits*, at 3 ("Temporary work permits would increase the earnings of undocumented

13  immigrants by about 8.5 percent as they are able to work legally and find jobs that match their

14  skills.").  Indeed, the upward mobility afforded by DACA is apparent from the results of a national

15  survey of 1,402 young adults who were approved for DACA through June 2013:

16
17  > Since receiving DACA, young adult immigrants have become more integrated into
> the nation's economic institutions.  Approximately 61% of DACA recipients
> surveyed have obtained a new job since receiving DACA.  Meanwhile, over half have
> opened their first bank account, and 38% have obtained their first credit card.
18

19  Roberto G. Gonzales and Veronica Terriquez, American Immigration Council, *How DACA is*

20  *Impacting the Lives of Those who are now DACAmented: Preliminary Findings from the National*

21  *UnDACAmented Research Project* (Aug. 15, 2013), available at: http://bit.ly/1jaS0tq (last visited

22  Oct. 9, 2017).  In short, DACA created significant economic benefits for qualifying individuals and

23  for the nation at large by permitting greater levels of contribution to the workforce by educated

24  individuals who previously had limited employment opportunities.

25  **The County's Employment Relationships With DACA Recipients**

26        32.  The County is one of the largest employers in the region, with more than 18,000

27  employees performing a vast array of functions to meet the needs of this diverse community.  One of

28  the main ways in which the County has benefited from the DACA program is through its

employment relationships with DACA recipients.  In particular, the County currently employs many DACA recipients as full-time employees.  The County has expended significant resources, both time and money, in training these employees and relies upon them to provide County services.  Because DACA recipients are under no obligation to identify themselves as such when they apply for a job, and they present the same form of work authorization card as other categories of immigrants, the County cannot determine with certainty the total number of DACA recipients it employs.

33.  DACA recipients are also employed through the County's In-Home Supportive Services program, which is funded through a combination of federal, state, and county funds.

34.  DACA recipients have special skills that make them especially valuable employees of the County.  For example, over ninety-five percent of DACA recipients are bilingual.  The County values this skill because it must employ a workforce that is able to meet residents' language needs to ensure meaningful access to County services, programs, and benefits.  *See* County of Santa Clara, Board Policy 3.58.  Indeed, forty-six percent of clients currently receiving health, financial, or employment assistance through the County Department of Employment and Benefit Services speak a primary language other than English.  Santa Clara Valley Medical Center, a public hospital owned and operated by the County, is required by law to provide qualified interpreters to limited-English-proficient individuals and relies on medical interpreters to satisfy that requirement.  It takes an average of five to six months to fill interpreter vacancies for the County's hospital and clinics, and the County has had difficulty filling several open positions.

35.  If the DACA recipients currently employed by the County were to lose their work authorization, the County would be forced to expend significant resources to temporarily cover those employees' responsibilities, conduct searches for replacements, and train new employees.  On average, it takes the County 81 days to fill a vacancy.  Nearly all County employees, including Local 521 members, are covered by merit system rules and collective bargaining agreements that protect them against arbitrary dismissal and other adverse employment actions, and that include anti-discrimination provisions.  Despite these protections, County employment is contingent on valid work authorization.  Without the DACA program, these valued employees will be unable to work for

1  the County or, indeed, to work in any legal capacity for any employer, public or private, within Santa

2  Clara County or the United States.

3        36.   The County also employs at least three DACA recipients in its New Americans

4  Fellowship Program.  This program aims to identify, recruit, develop, and equip DACA-eligible

5  youth with the skills and tools to serve as ambassadors to the Santa Clara County community.

6  Fellows commit to working at least 20 hours per week, for a period of no less than 10 weeks, on a

7  project-based fellowship under the supervision of a County Department, the County Office of

8  Immigrant Relations, or a Member of the Board of Supervisors' Office.  Examples of the types of

9  projects on which fellows work include:

- Research on improving/bridging relationships between law enforcement and the immigrant community;

- Developing a plan for a "Community Safety Initiative" focused on establishing problem-solving relationships between the immigrant and refugee population and local law enforcement;

- Developing the framework for a "Civics Empowerment Education Program" to establish the curriculum for immigrants and refugees who want to learn more about law and policy;

- Creating a training in civic participation to inform the community about federal, state, and county government structures and delivering presentations to decision-making bodies;

- Providing information to the undocumented population, including the following: know your rights at home, in the work place, and when seeking services via immigration consultants;

- Fraud prevention and education;

- Drafting or updating existing resources on family emergency plans;

- Increasing awareness of public services programs such as Medi-Cal, CalFresh, and Covered California;

- Launching a countywide campaign to promote financial literacy among immigrants and refugees; and

- Collaborating with banking institutions on providing financial planning tools for immigrants and refugees.

27        37.   The County began the New Americans Fellowship Program in July 2017.  Since that

28  time, 20 fellows have participated in the program and contributed significantly to the County and

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

12

their communities.  The County assigned ten fellows to County departments and community-based organizations throughout Santa Clara County and ten fellows participated in the "Silicon Valley Dream Summer," a fellowship program that places immigrant youth at community-based and social justice organizations.  The County has allocated funding to support additional fellows during the 2017-2018 fiscal year, but planning for the next cohort of fellows has been put on hold due to Defendants' actions.  Like other forms of County employment, the New Americans Fellowship Program cannot survive Defendants' rescission of DACA, for once existing work authorizations expire, DACA participant-employees will no longer be able to work for the County and the County will lose this bridge to their communities.

**Reliance on the DACA Program and the Government's Representations**

38.     Trusting the federal government's representations about the program, hundreds of thousands of young people from across the country have applied for and received DACA status since the program was initiated in 2012.  The DACA program has changed the lives of DACA recipients. Prior to DACA, many law-abiding undocumented young people saw little purpose to completing higher education because they would be unable to work legally upon graduation.  DACA gave them the ability to attend college, work to earn money to pay for higher education, and to utilize their degrees to attain high-skilled jobs.  It also gave them access to health care, and the opportunity to become more integrated into their communities.  DACA gave these young people hope that a better life was possible, and allowed them to emerge from the shadows of society to serve their communities, including through work for government agencies like the County of Santa Clara.

39.     Loss of DACA status and work authorization would be devastating for County workers who depend on the DACA program to maintain employment, health insurance, and other benefits.  Indeed, several County employees with DACA status desired to join as individual plaintiffs in this litigation challenging the DACA rescission, but ultimately chose not to come forward out of fear that Defendants would retaliate against them or their families.

40.     The County has also relied on the government's representations concerning the DACA program.  The County has expended significant time and financial resources in hiring and training DACA recipients for various positions in County.  Those employees carry out important

functions in County government and make significant contributions in providing services to County residents.  There is little reason for employers like the County to take the time and effort to hire and train DACA recipients who have received work authorization unless there is some assurance that those individuals will be eligible to renew that authorization.

**Other Benefits to the County from the DACA Program**

41.  Santa Clara County is home to Silicon Valley, where many of the country's leading high-tech and Internet-based companies are located.  Technology companies based in the county, including Apple and Google, employ tens of thousands of workers.  Similarly, health care providers, including Kaiser Permanente, Stanford Hospital and Clinics, and the County's own hospital and clinics, employ additional tens of thousands.  Many of these organizations employ DACA recipients.  For example, Tim Cook, CEO of Apple, recently noted that 250 Apple employees are "Dreamers," or DACA recipients.  Silicon Valley is projected to face a shortfall of 72,500 private sector workers by the year 2020, and immigration policies such as DACA, which increase the availability of skilled workers, help address this shortfall.  Indeed, Silicon Valley has long been reliant on the contributions of immigrants.  One study noted that immigrants launched a quarter of all engineering and technology companies in the United States from 1995 to 2005, Vivek Wadhwa et al., *America's New Immigrant Entrepreneurs: Part I*, Duke Science, Tech. & Innovation Paper No. 23 (Jan. 4, 2007), available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=990152## (last visited Oct. 9, 2017), and over half of Silicon Valley start-ups in the same period count at least one immigrant as a key founder, Richard T. Herman, Immigrant, Inc.: Why Immigrant Entrepreneurs Are Driving the New Economy (and how they will save the American worker) 5 (2009).

42.  In 2016, the Migration Policy Institute (MPI) estimated that there were 23,000 DACA-eligible individuals in Santa Clara County, including 15,000 who were immediately eligible.  MPI, Deferred Action for Childhood Arrivals Data Tools, available at: http://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles (last visited Oct. 9, 2017).  According to MPI's estimates, Santa Clara County has the twelfth largest DACA-eligible population among counties nationwide, and the largest DACA-eligible population of all northern California counties.  MPI, National and County Estimates of Populations Eligible for

Deferred Action for Childhood Arrivals Program, 2016, available at:

http://www.migrationpolicy.org/sites/default/files/datahub/State-County-DACA-Estimates.xlsx (last visited Oct. 9, 2017).

43.   Ninety-one percent of DACA recipients are employed.  John W. Schoen, *DACA Deportations Could Cost US Economy More than $400 Billion*, CNBC.com (Sept. 5, 2017), available at: https://www.cnbc.com/2017/09/05/daca-deportations-could-cost-us-economy-more-than-400-billion.html (last visited Oct. 9, 2017).  It is estimated that if DACA recipients lose the ability to work legally, California alone would suffer a GDP loss of approximately $11.3 billion a year.  *Id.*  As one of the counties with the largest number of DACA recipients, much of this negative economic effect will be felt in Santa Clara County.

44.   Moreover, because they are able to work legally, DACA recipients are employed in more highly compensated jobs and contribute more in state and local taxes than they would without DACA.  One recent study estimates that the 1.3 million young people immediately eligible for DACA contribute $2 billion a year in state and local taxes.  Institute on Taxation and Economic Policy, *State & Local Tax Contributions of Young Undocumented Immigrants* (Apr. 25, 2017), available at: https://itep.org/state-local-tax-contributions-of-young-undocumented-immigrants/ (last visited Oct. 9, 2017).  Indeed, "DACA-eligible individuals pay on average 8.9 percent of their income in state and local taxes.  Their effective tax rate is higher than the average rate paid by the top 1% of taxpayers in state and local taxes . . . ."  *Id.*  "Repealing the temporary legal status and work authorizations permitted by DACA would reduce estimated state and local revenues by nearly $800 million . . . ."  *Id.*  The same study estimates that DACA eligible individuals contribute more than $530 million in state and local taxes in California alone and, because Santa Clara County has a large number of DACA-eligible residents, the County stands to lose significant tax revenue because of the rescission of DACA.

45.   In addition to its broad negative effects on the County's economy and fisc, the rescission of DACA will make it more difficult and expensive for the County to provide services to its residents.  For example, DACA recipients who do not have employer-sponsored insurance and who satisfy income-eligibility requirements qualify for "full-scope" coverage under Medi-Cal,

California's Medicaid program.  Through Medi-Cal, DACA recipients receive coverage for a core set of health benefits, including preventative care, doctor's visits, immunizations, prescriptions, and mental health and substance abuse services.  If these individuals lose deferred action status, they will be eligible only for very limited Medi-Cal coverage of emergency and pregnancy-related services, increasing their reliance on other safety-net health care services provided by the County.

46.    The County operates the Santa Clara Valley Medical Center ("SCVMC"), a public safety-net Level I trauma hospital that provides critical health care services to poor and uninsured County residents.  Payments from these patients and from public insurance programs such as Medi-Cal do not cover the costs of services they receive at SCVMC.  As a result, each year the County provides a substantial subsidy to SCVMC to cover deficits incurred by SCVMC in serving these patients.  During the first three quarters of Fiscal Year 2017, SCVMC operated at a deficit of well over $90 million.  Rescission of the DACA program will negatively affect SCVMC.  Because DACA recipients who are now employed pursuant to work authorization granted under the program will lose their jobs – and their employer-sponsored health insurance – former DACA recipients, and family members who were covered by the recipient's insurance, are more likely to fall back on safety-net hospitals like SCVMC.  Additionally, lacking employer-sponsored health insurance, unable to access full-scope Medi-Cal, and burdened with a fear of detention and deportation, these individuals are less likely to obtain regular check-ups and routine, preventative care.  As a result, they will be more likely to seek medical care only when health problems worsen – often at SCVMC's Emergency Department – at which point care becomes more difficult and more expensive.  The rescission of DACA will increase the County's costs in subsidizing free and below-cost care at SCVMC.

47.    In addition to health care, the County provides (and is often required to provide) many other services to community members regardless of immigration status, and it will become more difficult to provide these services to DACA recipients after they lose deferred action status because of their renewed hesitancy to interact with the government for fear of detention and deportation.  At the same time, it will be even more critical for individuals who lose DACA status to access County services – and the County will need to spend more to support them – because the

1   same individuals will be losing work authorization and, thus, the ability to work legally to support

2   themselves and their families.

3       48.    For example, the County invests significant resources in programs to provide housing

4   to the homeless and to prevent homelessness.  In fiscal year (FY) 2015, the County allocated over

5   $73.8 million in resources to housing and related services countywide and, in 2015, the Board of

6   Supervisors approved increasing these expenditures by a total of $33.9 million over FY 2016-2018.

7   In addition to providing housing to homeless individuals and families who utilize other County

8   services, the County also funds homelessness prevention and emergency housing programs,

9   including homeless shelters, a cold weather shelter program, interim housing for the chronically

10  homeless, and 24-hour care shelter placements.  Because DACA recipients are able to obtain work

11  authorization and work legally, the program has helped recipients support themselves and their

12  families, greatly reducing their risk of homelessness and reliance on County services.  These benefits

13  are lost with rescission of the DACA program.

14      49.    The DACA program also reduces reliance on the County's safety-net services by

15  keeping families together.  Twenty-five percent of DACA recipients have at least one U.S.-born

16  child.  Dara Lind, *9 facts that explain DACA, the immigration program Trump is threatening to end*,

17  Vox.com (Sept. 5, 2017), available at: https://www.vox.com/policy-and-

18  politics/2017/8/31/16226934/daca-trump-dreamers-immigration (last visited Oct. 9, 2017).  If these

19  parents lose DACA status and are subject to deportation, some of their U.S. citizen children may

20  enter the foster care system.  The County provides financial support to foster parents to meet the

21  basic needs of foster youth placed in their care.  In the 2017 fiscal year, the County invested $25

22  million in foster care youth, and rescission of the DACA program could bring more young people

23  into the system, increasing costs and placing greater strains on County resources.

24      50.    Rescission of DACA would also hinder the County's ability to protect the public

25  health and the safety of its residents.  The County's Public Health Department ("PHD") runs

26  numerous programs that protect the health not only of the individual served, but of the wider

27  community.  PHD provides immunization clinics, tuberculosis testing, STD testing, and other

28  services that prevent the spread of communicable diseases.  DACA has improved PHD's ability to

provide these critical services to immigrant communities by alleviating the fear of deportation that often prevents undocumented immigrants from seeking government services.  If DACA recipients lose their deferred action status, they – and their U.S. citizen children – may be less likely to receive necessary immunizations and testing, thereby increasing health risks for the community as a whole.

51.     For similar reasons, DACA has had a positive effect on the relationship between immigrant communities and local law enforcement.  Because of a justified fear of detention and deportation, undocumented individuals are often hesitant to contact law enforcement even when they are victims of crimes.  By providing an assurance that they are protected from immigration enforcement actions, DACA has permitted recipients to be more willing to report crimes, act as witnesses, and otherwise cooperate with local law enforcement, as well as with other emergency services and first responders.  This improved relationship is invaluable not just to DACA recipients themselves, but also to their communities and the County.

52.     DACA has had a similar effect on the County's Code Enforcement Division, which enforces zoning and building ordinances to ensure safe living conditions for county residents. The County has received reports that some tenants are reluctant to come forward with reports of code violations because landlords have threatened to report immigrants to ICE.  DACA status substantially reduces that threat, thereby helping the County ensure that unsafe or unsanitary housing conditions are abated for the safety and benefit of the entire community.

53.     DACA's benefits to the County are also evidenced by the County's willingness to invest in DACA recipients.  For example, the County previously allocated $200,000 for outreach and education concerning the DACA program, to ensure that eligible County residents know of and have support necessary to apply for DACA status.  Just after the administration's announcement that DACA would be rescinded, the County allocated an additional $200,000 from its emergency reserve to establish an emergency program to help DACA recipients submit renewal applications before the administration's arbitrary October 5, 2017 deadline.  Additionally, the County has allocated $400,000 to the New Americans Fellowship Program, described above.

54.     In light of the many ways in which the County has benefited from the DACA program, on August 15, 2017, the County's Board of Supervisors unanimously adopted a resolution

affirming its support for the DACA program and its commitment to immigrant youth and young adults.

**Rescission of the DACA Program**

55.     The administration's decision to rescind the DACA program was announced by Attorney General Jefferson Sessions at a press conference on September 5, 2017.  In his statement, Attorney General Sessions made a number of factual assertions concerning the DACA program that are demonstrably false, including the statement that DACA had "denied jobs to hundreds of thousands of Americans" and that DACA "contributed to a surge of unaccompanied minors on the southern border that yielded terrible humanitarian consequences."  Notably, the Attorney General provided no evidence to support these assertions and gave no indication that the administration had studied DACA or its effects in any meaningful or systematic fashion.  Rather, he simply assumed that DACA had negative effects, completely ignored the program's positive effects, and concluded that "[o]ur collective wisdom is that the policy is vulnerable to the same legal and constitutional challenges that the courts recognized with respect to the [Deferred Action for Parents of Americans and Lawful Permanent Residents] program."

56.     Shortly after the press conference, Acting Secretary Duke issued a memorandum formally rescinding DACA.  The memorandum stated that DHS would not consider any initial DACA applications received after September 5, 2017.  As for individuals who currently have DACA status and work authorization, the memorandum stated that DHS would adjudicate pending renewal requests properly filed and accepted by DHS as of September 5, 2017, and renewal requests properly filed and accepted by DHS by October 5, 2017 from individuals whose DACA benefits expire between September 5, 2017 and March 5, 2018.  All other DACA renewal requests, including any requests received after October 5, 2017, would be rejected.

57.     Acting Secretary Duke's memorandum did not explain the administration's reasons for rescinding DACA and gave no indication that the administration had considered the benefits of the program before abruptly ending it.  Rather, the memorandum simply refers to the Attorney General's speculation that the DACA program may be held unlawful, explaining that the Fifth Circuit had held *different* programs (Deferred Action for the Parents of Americans and Lawful

Permanent Residents ("DAPA") and an expansion of the DACA) to be unlawful, and that this decision was affirmed by an equally divided Supreme Court.  Secretary Duke's memorandum cites a September 4, 2017 letter from Attorney General Sessions, which provides no legal analysis whatsoever and simply concludes that "it is likely that potentially imminent litigation would yield similar results with respect to DACA."

58.    On the same day that Attorney General Sessions announced the rescission of DACA, DHS published guidance in the form of "frequently asked questions" ("FAQs") concerning the rescission of DACA.  These FAQs reflect a changed orientation toward the use of DACA applicants' information for immigration enforcement.  Previously, applicants had been told that "Information provided in [a DACA] request is protected from disclosure to ICE and CBP [U.S. Customs and Border Protection] for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance . . . ."  USCIS, DACA Frequently Asked Questions, available at: https://www.uscis.gov/archive/frequently-asked-questions (last visited Oct. 9, 2017). By contrast, the September 5, 2017 guidance provides: "Information provided to USCIS in DACA requests will not be *proactively provided* to ICE and CBP for the purpose of immigration enforcement proceedings, unless the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance . . . ." DHS, Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals (Sept. 5, 2017) (emphasis added), available at: https://www.dhs.gov/news/2017/09/05/frequently-asked-questions-rescission-deferred-action-childhood-arrivals-daca (last visited Oct. 9, 2017).  This change appears to indicate that information provided by DACA applicants *will* be used for immigration enforcement purposes, and made available to ICE and CBP upon request, even if not "proactively provided."

### FIRST CLAIM FOR RELIEF
### Violation of Due Process
### U.S. Const. amend. V

59.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

60.     The County has a constitutionally protected interest in its employment relationships with its employees, including DACA recipients, as well as protected interests in the benefits that flow from those relationships.  The County employs DACA recipients as full-time and part-time employees, and as fellows in the County's New Americans Fellowship Program.  The County has made significant investments of employee-time and money to hire and train those employees.  The rescission of the DACA program, and DACA recipients' consequent inability to apply for renewed work authorization, will necessarily result in the termination of those employment relationships.  The County will therefore lose not only its investment in these employees, but also the benefit of their expertise and experience.

61.     County employees and others who participate in the DACA program, including Local 521 members, have a constitutionally protected interest in their jobs.  As a result of the rescission, when their current two-year authorization expires, employees who participate in the DACA program will no longer be able to keep their jobs with the County or with other employers.

62.     The County has a constitutionally protected interest in the programs and services it offers to County residents, including the funds expended to support those programs.  It will become more difficult to provide these services to DACA recipients after they lose deferred action status because of their renewed hesitancy to interact with the government for fear of detention and deportation.  At the same time, it will be even more critical for individuals who lose DACA status to access County services – and the County will need to spend more to support them – because the same individuals will be losing work authorization and, thus, the ability to work legally to support themselves and their families.

63.     Rescission of the DACA program and Defendants' actions in accordance therewith unlawfully deprive the County, its employees and its residents of these and other constitutionally protected interests without due process of law.  Such deprivation occurred with no notice or opportunity to be heard.

64.     Moreover, to the extent that Defendants seek to use for purposes of immigration enforcement the information that DACA recipients provided in connection with their applications, such use would also violate due process.  The Due Process Clause of the Fifth Amendment requires

that the federal government's immigration enforcement actions be fundamentally fair.  Defendants induced DACA applicants to provide this information with the express promise that it would not be used against the applicant in immigration enforcement proceedings.  For Defendants to turn around and now use this information as they previously promised they would not, would abuse DACA applicants' trust in government and offend fundamental principles of fairness and justice.

65.    Rescission of the DACA program violated the Due Process Clause of the Fifth Amendment to the United States Constitution.  Likewise, use of the information DACA recipients provided to Defendants as part of their DACA applications to target DACA recipients or their families for removal or to support removal proceedings would violate the Due Process Clause of the Fifth Amendment.

66.    The County, its employees and its residents, and Local 521 and its members have been harmed and continue to be harmed by these unlawful acts.

### SECOND CLAIM FOR RELIEF
### Violation of Administrative Procedure Act
### Arbitrary and Capricious Agency Action
### 5 U.S.C. §706

67.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

68.    The Department of Homeland Security is subject to the requirements of the APA.  *See* 5 U.S.C. §703.  The termination of the DACA program is final agency action subject to judicial review because it marks the "consummation of the . . . decisionmaking process" and is one "from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks omitted).

69.    Under 5 U.S.C. §706(2), courts shall "hold unlawful and set aside" agency action found to be arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law; contrary to a constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; without observance of procedure required by law.

70.    Rescission of the DACA program is final agency action subject to APA review by this Court.

71.     Defendants' actions rescinding DACA are arbitrary and capricious, an abuse of discretion, and not in accordance with law because, among other things, Defendants have not identified a reasonable explanation for their decision to do so.  Nor in rescinding the DACA program did Defendants consider all relevant factors, including the benefits provided by the program.  Not only have Defendants failed to meaningfully assess the benefits of the DACA program, but they have not addressed the comprehensive legal arguments previously developed by DHS itself and the Department of Justice's Office of Legal Counsel as to why the DACA program is a lawful exercise of prosecutorial discretion.  The failure to address these legal opinions, or offer any legal reasoning, is especially egregious in this case, given that the only rationale for rescinding DACA offered in Defendant Duke's September 5 memorandum is that the program is likely to be found unlawful.  Defendants have committed a clear error in judgment.

72.     Defendants also disregarded the serious reliance interests created by the DACA program, including those of the County and DACA recipients.  On the basis of Defendants' representations that the DACA program would provide them an avenue to come out of the shadows and participate more fully in their communities, and that the information they provided to Defendants would not be used against them in immigration proceedings, DACA recipients applied for deferred action status and organized their lives around the expectation that they would be permitted to maintain that status as long as they were in compliance with program requirements.  Where "longstanding policies may have 'engendered serious reliance interests,'" those interests "must be taken into account."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting *FCC v. Fox Tele. Stations, Inc.*, 556 U.S. 502, 515 (2009)).  "[A] reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy," *id.* (quoting *Fox*, 556 U.S. at 516), and "[i]t follows that an '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice."  *Id.* (quoting *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

73.     The County, its employees, and its residents, and Local 521 and its members have been harmed and continue to be harmed by these unlawful acts.

### THIRD CLAIM FOR RELIEF
### Violation of Equal Protection
### U.S. Const. amend. V

74.    Plaintiffs re-allege and incorporate by reference all of the allegations set forth in this Complaint.

75.    Defendants' actions rescinding DACA target Latinos and, specifically, immigrants from Mexico, and are motivated by animus toward these groups.  Of the approximately 1.59 million DACA applications (both initial and renewal) that were approved from the beginning of the program through March 2017, approximately 1.48 million, or approximately 93%, were submitted by people from countries in Latin America and approximately, 1.24 million, or approximately 80%, were from Mexican immigrants.  Accordingly, the overwhelming majority of the direct beneficiaries of the DACA program have been Latinos and Mexican immigrants.  There is no question but that rescission of the DACA program imposes a disproportionate burden on Latinos generally and, specifically, persons from Mexico.

76.    The rescission is motivated by impermissible animus.  From the moment he launched his campaign, President Trump has publicly announced his animus toward Latinos and Mexican immigrants.  Indeed, such animus was a feature of his campaign, in which President Trump distinguished himself with his hardline stance on immigration, highlighted by harsh rhetoric disparaging Mexican immigrants.  In the speech in which he announced his candidacy, President Trump stated: "When Mexico sends its people, they're not sending their best. . . .  They're sending people that have lots of problems, and they're bring those problems with us [sic].  They're bringing drugs.  They're bringing crime.  They're rapists."  As an afterthought, he added, "[a]nd some, I assume, are good people."  Later, then-candidate Trump repeatedly disparaged the federal district judge presiding over a case brought by students alleging they were defrauded by Trump University, calling the judge a "hater" who is "very hostile" to President Trump because, as the President has explained on different occasions, he "happens to be Spanish," is "Hispanic," or "happens to be, we believe, Mexican."  More recently, in August 2017, at a rally in Phoenix, President Trump referred to undocumented immigrants as "animals" who are responsible for "the drugs, the gangs, the cartels, the crisis of smuggling and trafficking."  Throughout his campaign and in his first months in office,

the President has maintained this attitude, culminating in the decision to rescind the DACA program.

77. Moreover, other factors indicative of an intent to discriminate are present in this case. In rescinding the DACA program, Defendants departed significantly from normal procedures. In particular, Defendants elected to entirely forego the APA procedures required for implementation of a categorical rule such as the rescission of DACA. Additionally, the purported justifications offered for the rescission are plainly pretextual. The September 5, 2017 memorandum from Defendant Secretary Duke announcing the rescission explains only that the Fifth Circuit had held the *different* DAPA program and an expansion of DACA to be unlawful, and that this decision was affirmed by an equally divided Supreme Court. Secretary Duke's memorandum cites a September 4, 2017 letter from Attorney General Sessions, which provides no legal analysis whatsoever and simply concludes that "it is likely that potentially imminent litigation would yield similar results with respect to DACA." No court has considered the lawfulness of the DACA program at issue here.

78. As such, the rescission of DACA deprives Latino DACA recipients of equal protection of the laws, guaranteed by the Fifth Amendment. The County, Local 521, and its members are harmed and continue to be harmed by Defendants' actions.

## FOURTH CLAIM FOR RELIEF
### Declaratory Relief – Equitable Estoppel

79. Plaintiffs re-allege and incorporate by reference all of the allegations set forth in this Complaint.

80. The federal government, by its conduct and explicit statements, represented to eligible applicants that the information applicants provided in connection with applications for deferred action status would not be used in immigration enforcement proceedings, except in certain limited circumstances, and that DACA recipients would have the opportunity to apply for renewed deferred action status at the end of their respective two-year authorization periods.

81. In reliance on these assurances, DACA applicants identified themselves to the government, acknowledging their undocumented status, and provided important information about themselves and their family members that exposed them to the risk of deportation.

82.     From the initial implementation of DACA to the announcement rescinding the program, the government continuously made representations about the validity and legality of the program, the use of information provided by applicants, and the continuing opportunity to apply for renewal of deferred action status.

83.     DACA recipients rearranged their lives, daring to become more visible and more integrated into the fabric of their communities, including by seeking employment, pursuing higher education, and paying taxes.  But now they are at a heightened risk of removal and deportation because of their reliance on the government's prior statements.

84.     Therefore, Defendants should be equitably estopped from terminating the DACA program and from using information provided pursuant to DACA for immigration enforcement purposes, except as previously authorized under DACA.

85.     An actual controversy between Plaintiffs and Defendants exists as to whether Defendants should be equitably estopped.

86.     Plaintiffs are entitled to a declaration that Defendants are equitably estopped.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

A.      Vacate and set aside the rescission of the DACA program and any other action taken by Defendants in furtherance of the rescission;

B.      Declare that the rescission of DACA and Defendants' actions in connection therewith are void and without legal force or effect;

C.      Declare that the rescission of DACA and Defendants' actions in connection therewith are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedure required by law in violation of 5 U.S.C. §§702-06;

D.      Declare that the rescission of DACA and Defendants' action in connection therewith violate the Constitution and laws of the United States;

E.      Declare that Defendants are equitably estopped from terminating the DACA program or from using information provided pursuant to DACA for immigration enforcement purposes, except as previously authorized under the program;

1    F.      Preliminarily and permanently enjoin and restrain Defendants, their agents, servants,

2  employees, attorneys, and all persons in active concert or participation with any of them, from

3  implementing or enforcing the rescission of DACA and from taking any other action that is not in

4  compliance with applicable law;

5    G.      Preliminarily and permanently enjoin and restrain Defendants, their agents, servants,

6  employees, attorneys, and all persons in active concert or participation with any of them, from

7  sharing or otherwise using information provided pursuant to the DACA program for immigration

8  enforcement purposes, except as previously authorized under the program;

9    H.      Award Plaintiffs reasonable attorneys' fees and costs; and

10    I.      Grant Plaintiffs such further and additional relief as the Court deems just and proper.

11 Dated:  October 10, 2017                              Respectfully submitted,

12                                                        /s/ James R. Williams

13                                                       JAMES R. WILLIAMS, County
                                                         Counsel
14                                                       GRETA S. HANSEN
                                                         LAURA S. TRICE
15                                                       MARCELO QUIÑONES
                                                         OFFICE OF THE COUNTY COUNSEL
16                                                       COUNTY OF SANTA CLARA
                                                         70 West Hedding Street
17                                                       East Wing, Ninth Floor
                                                         San Jose, CA 95110-1770
18                                                       Telephone:  (408) 299-5900
                                                         Facsimile:  (408) 292-7240
19                                                       laura.trice@cco.sccgov.org
                                                         marcelo.quinones@cco.sccgov.org
20
                                                         *Attorneys for Plaintiff County of Santa*
21                                                       *Clara*

22                                                       /s/ Eric P. Brown
                                                         JONATHAN WEISSGLASS
23                                                       STACEY M. LEYTON
                                                         ERIC P. BROWN
24                                                       ALTSHULER BERZON LLP
                                                         177 Post St., Suite 300
25                                                       San Francisco, CA 94108
                                                         Telephone:  (415) 421-7151
26                                                       jweissglass@altber.com;
                                                         sleyton@altber.com;
27                                                       ebrown@altber.com

28                                                       *Attorneys for all Plaintiffs*