1   JAMES R. WILLIAMS, County Counsel (SBN 271253)
    GRETA S. HANSEN (SBN 251471)
2   LAURA S. TRICE (SBN 284837)
    MARCELO QUIÑONES (SBN 279132)
3   HANNAH KIESCHNICK (SBN 319011)
    OFFICE OF THE COUNTY COUNSEL
4   70 West Hedding Street, East Wing, Ninth Floor
    San José, California 95110
5   Telephone: (408) 299-5900
    Facsimile: (408) 292-7240
6   laura.trice@cco.sccgov.org
    marcelo.quinones@cco.sccgov.org
7   hannah.kieschnick@cco.sccgov.org

8   *Attorneys for Plaintiff County of Santa Clara*

9   STACEY M. LEYTON (SBN 203827)
    ALTSHULER BERZON LLP
10  177 Post St., Suite 300
    San Francisco, CA 94108
11  Telephone: (415) 421-7151
    Facsimile: (415) 362-8064
12  sleyton@altber.com

13  *Attorney for all Plaintiffs*

14                  UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF CALIFORNIA
15                    SAN FRANCISCO DIVISION

16

17  COUNTY OF SANTA CLARA and SERVICE          Case No. 3:17-cv-05813-WHA
    EMPLOYEES INTERNATIONAL UNION
18  LOCAL 521                                   **AMENDED COMPLAINT FOR
                                                DECLARATORY AND INJUNCTIVE
19              Plaintiffs,                      RELIEF**

20  v.

21  DONALD J. TRUMP, *in his official capacity as
    President of the United States*; CHAD F.
22  WOLF, *in his official capacity as Acting
    Secretary of the Department of Homeland
23  Security*; U.S. DEPARTMENT OF
    HOMELAND SECURITY; JOSEPH EDLOW,
24  *in his official capacity as Deputy Director of
    Policy of USCIS*; and U.S. CITIZENSHIP AND
25  IMMIGRATION SERVICES,

26              Defendants.

27

28

**INTRODUCTION**

1. Plaintiffs County of Santa Clara ("County") and Service Employees International Union Local 521 ("Local 521"), acting in its capacity as the representative of more than 11,000 County employees, challenge the unlawful actions of the President of the United States and the federal government related to their attempts to terminate or curtail the Deferred Action for Childhood Arrivals ("DACA") program.

2. Since 2012, DACA has protected from deportation and extended work authorization to more than 800,000 young people who were brought to this country as children through no fault of their own. Under its original terms, the DACA program affords recipients a two-year period of "deferred action," meaning they are not subject to immigration enforcement actions during that time, and work authorization, allowing them to work legally, report income, and pay taxes.

3. The DACA program has been hugely successful. Recipients have been able to come out of the shadows of American life, work legally to support themselves and their families, go to school, pay taxes, and participate more fully in their communities. Their families have benefitted from the higher wages many recipients are able to earn and the stability of knowing that loved ones will not be separated. And the communities in which DACA recipients live—including the County of Santa Clara—have benefitted not only from the taxes paid by recipients as they work legally and report income, but also from DACA recipients' increased willingness to interact with government institutions, such as by contacting and cooperating with law enforcement and public health officials.

4. Despite these extensive benefits, Defendants have sought to rescind or undermine key components of the DACA program for arbitrary and inconsistent reasons.

5. On September 5, 2017, Defendants attempted to categorically terminate the DACA program, through a U.S. Department of Homeland Security ("DHS") Memorandum issued by former Acting Secretary Elaine Duke ("Duke Memorandum"). The Duke Memorandum stated that DHS would not consider any initial DACA applications received after September 5, 2017, and explained that current DACA recipients would no longer be able to renew after October 5, 2017. The Duke Memorandum gave no explanation for rescinding DACA other than that the Attorney General had concluded that the program was unlawful, and gave no indication that the Administration had

2

considered the benefits of the program, changes that could be made to the program to address any unlawful aspects, or the reliance interests of recipients, their families, communities, and employers, before ending it so abruptly.

6.     In January 2018, this Court entered a preliminary injunction requiring DHS to continue processing renewal applications; the Ninth Circuit affirmed; and ultimately, on June 18, 2020, the Supreme Court set aside the Duke Memorandum rescinding DACA as arbitrary and capricious under the Administrative Procedure Act.  The Supreme Court also denied the federal government's then-pending petition for certiorari from a ruling of the U.S. Court of Appeals for the Fourth Circuit, which likewise concluded that the Duke Memorandum was arbitrary and capricious and must be set aside.  Shortly thereafter, the Fourth Circuit issued the mandate associated with its ruling.

7.     Notwithstanding the Supreme Court's decision and the Fourth Circuit's mandate, DHS did not return to the *status quo ante* and restore the DACA program on its original terms. Instead of complying with its legal obligations under the Supreme Court and Fourth Circuit decisions, it "generally held" initial DACA applications starting June 18, 2020, and requests for advance parole starting July 24, 2020, both "in anticipation of potential policy changes" to the program.  DHS has represented that it continued to process and grant DACA renewal requests during this period.

8.     The anticipated policy changes came July 28, 2020, when Defendant Chad Wolf—the purported Acting Secretary of Homeland Security—issued without authority a memorandum (the "Wolf Memorandum") directing DHS to make immediate "interim" changes to DACA while he considered whether to fully rescind the program.  The Wolf Memorandum orders DHS to reject all new initial DACA applications, to reject all advance parole applications absent exceptional circumstances, and to reduce the renewal period for current DACA recipients from two years to one year.  The Wolf Memorandum unlawfully applies these changes retroactively to all applications submitted after the Supreme Court's June 18, 2020 decision.

9.     Defendant Joseph Edlow, in his purported capacity as Deputy Director of Policy of Defendant United States Citizenship and Immigration Services ("USCIS"), issued a policy directive

purporting to implement the Wolf Memorandum (the "Edlow Directive") and instructing USCIS staff to reject DACA renewal requests received more than 150 days prior to the expiration of the DACA recipients' current renewal period.

10.     Defendants' latest actions to diminish or rescind core components of the DACA program are unlawful and must be set aside, for multiple independent reasons.

11.     Because Defendant Wolf was, and continues to be, improperly serving in the role of Acting Secretary of Homeland Security in violation of the Federal Vacancies Reform Act of 1998 ("FVRA"), 5 U.S.C. § 3341 *et seq.*, and the Homeland Security Act of 2002, 6 U.S.C. § 111 *et seq.* ("HSA"), he lacked the authority to direct changes to the DACA program or to appoint Defendant Edlow as Deputy Director of Policy of Defendant USCIS.  Accordingly, the Wolf Memorandum and the Edlow Directive are void and must be set aside as unlawful under the FVRA and HSA, and as in excess of statutory authority under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702(2)(A).  Moreover, even if Defendant Wolf had been lawfully serving under the FVRA and HSA, both his unreasonably long tenure as Acting Secretary and his appointment by another inferior officer violate the Appointments Clause, and the actions he has taken in that role are unlawful.

12.     In addition, the Wolf Memorandum and the Edlow Directive constitute arbitrary and capricious decision making under the APA.  They make immediate, interim changes to DACA based on policy justifications that are not supported by evidence and that are, in any event, untethered to the interim actions taken.  And they are based on a concededly incomplete consideration of the relevant factors, including the reliance interests engendered by the program and the harms or legality of applying any interim changes retroactively.

13.     For these reasons, Plaintiffs ask this Court to declare the Wolf Memorandum and Edlow Directive unlawful and unenforceable, and to enjoin and restrain Defendants from taking further steps to modify the DACA program pursuant to those unlawful actions.  The DACA program has worked to the benefit of DACA recipients, their families, their employers, local communities, and American society as a whole.  These stakeholders deserve, and the law demands, better.

**JURISDICTION AND VENUE**

14.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, and 2201–02,

1   because this action arises under the Appointments Clause of the U.S. Constitution, U.S. Const. art.

2   II, § 2, cl. 2; the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*; the Federal Vacancies

3   Reform Act of 1998, 5 U.S.C. § 3345 *et seq.*; and the Homeland Security Act of 2002, 6 U.S.C.

4   §§ 112–13.  This Court has additional remedial authority under the APA, 5 U.S.C. §§ 701–06.

5          15.     There exists an actual and justiciable controversy between Plaintiffs and Defendants

6   requiring resolution by this Court.  Plaintiffs have no adequate remedy at law.

7          16.     Venue is proper in the Northern District of California.  Plaintiff County of Santa Clara

8   is a public entity in this judicial district and a substantial part of the events or omissions giving rise to

9   this action have occurred or will occur in this District.  28 U.S.C. §§ 1391(b)(2), 1391(e)(1).

10  Plaintiff Local 521 is located in the Northern District of California and many of its members, on

11  whose behalf it brings this lawsuit, reside and are employed within the Northern District of

12  California.  This is a civil action in which Defendants are agencies of the United States or officers

13  thereof and no real property is involved in this action.

14                                              **PARTIES**

15         17.     Plaintiff County of Santa Clara is a charter county organized and existing under the

16  laws of the State of California.  With an estimated population of more than 1.9 million people, Santa

17  Clara County is the largest county in the Bay Area and the sixth largest county in California.  As a

18  county of immigrants, the County has especially benefited from DACA and is especially harmed by

19  the "interim" changes to the program.  Thirty-eight percent of Santa Clara County residents are

20  foreign born, and approximately sixty percent of children in the County have at least one parent who

21  is foreign born.  Santa Clara County has the highest percentage of foreign-born residents of all

22  counties in California.  More than half of County residents speak a language other than English at

23  home, and more than 100 languages and dialects are spoken within the County.

24         18.     The County is the level of government tasked with provision of core safety-net

25  services to this diverse community.  It employs a workforce of more than 23,000 and must ensure

26  that this workforce possesses the skills necessary to effectively serve this community.  The County

27  employs DACA recipients in key positions throughout the organization, providing upward mobility

28  to young people who deserve the opportunity to serve their communities through the public sector,

and leveraging the unique experience and skills these employees bring to the County government.

19.     Plaintiff Service Employees International Union Local 521 is a labor union that represents approximately 40,000 public- and private-sector workers in the Bay Area and California's Central Valley, including more than 11,000 who are employed by the County of Santa Clara.  Local 521 is an affiliate of the Service Employees International Union ("SEIU"), which represents 2.2 million working men and women around the world.  A large percentage of Local 521's membership is Latino and many are first-generation immigrants.  The primary mission of Local 521 is to organize, represent, and empower employees.

20.     In addition, Local 521 works in partnership with SEIU and other groups to combat discrimination and mobilize for immigration reform at the national level.  Local 521's efforts include its Committee on Comprehensive Immigration Reform, a member-based committee that engages in organizing, advocacy, and education to help undocumented workers.  Local 521 has conducted "know your rights" information sessions and workshops, engaged in legislative advocacy on immigration-related bills at the state level, held community forums on DACA and Deferred Action for Parents of Americans and Lawful Permanent Residents in conjunction with the California Attorney General, and participated as an amicus in litigation brought by the County of Santa Clara and others challenging the Trump administration's threat to cut off federal funding to sanctuary cities and counties.  Local 521 has members who are DACA recipients, including members who work for the County of Santa Clara.  These members are able to work and, thus, to be Local 521 members, because of the work authorization they obtain through the DACA program.  These members would be unable to work should their deferred action and work authorization lapse due to the shortened renewal period.  In addition, Local 521 members have children, siblings, and other relatives who would have been eligible to apply for DACA between the time that Defendants terminated accepting DACA applications in September 2017 and the present, and who would have applied for DACA or would now apply for DACA but for Defendants' unlawful actions.

21.     Local 521 brings this action as an associational plaintiff on behalf of its members who are DACA recipients, asserting claims on behalf of those members.  Local 521 also brings this lawsuit to protect the rights and interests of its members and prospective members, to preserve its

6

1  ability to organize new members who are DACA recipients, and to preserve its representational

2  relationship with current DACA recipients.

3      22.    Defendant Donald J. Trump is the President of the United States.  President Trump

4  made the decisions to rescind the DACA program and is sued in his official capacity.

5      23.    Defendant Chad F. Wolf is the purported Acting Secretary of Homeland Security.

6  The Acting Secretary is responsible for managing DHS, and oversees the United States Citizenship

7  and Immigration Service ("USCIS") and the Immigration and Customs Enforcement ("ICE").  The

8  Acting Secretary's responsibilities include the administration and enforcement of policies and

9  practices related to immigration, including the DACA program.  Defendant Wolf is sued in his

10  official capacity.

11      24.    Defendant Department of Homeland Security ("DHS") is a federal agency

12  responsible for implementing, administering, and enforcing the nation's immigration laws and

13  policies, including the DACA program.  DHS is a Department of the Executive Branch and is an

14  agency within the meaning of 5 U.S.C. § 552(f)(1).

15      25.    Defendant Joseph Edlow is serving as the Deputy Director of Policy of USCIS.

16  Defendant Wolf purported to appoint Defendant Edlow as Deputy Director of USCIS on February

17  19, 2020, and addressed his July 28, 2020 Memorandum to Defendant Edlow, among others.

18  Defendant Edlow issued the challenged Edlow Directive in his purported capacity as USCIS Deputy

19  Director of Policy.  He is sued in his official capacity.

20      26.    Defendant USCIS is a component of DHS, 6 U.S.C. § 271, and an agency within the

21  meaning of 5 U.S.C. § 551(1).  USCIS is the agency responsible for processing and adjudicating

22  DACA applications.

23      **FACTUAL BACKGROUND**

24  **The DACA Program**

25      27.    On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano issued a

26  memorandum establishing the DACA program.  According to the memorandum, the purpose of the

27  program was to appropriately allocate resources to individuals who were higher priorities for

28  immigration enforcement.  In addition, the memorandum recognized that it made little sense to

1   punish individuals who were brought to the United States as children, through no fault of their own,

2   and who had proven themselves to be trustworthy, contributing members of their communities.

3   Finally, DACA was intended to generate wide-reaching benefits that would accrue to recipients,

4   their families, and their communities, as undocumented individuals would be permitted to live and

5   work without the ever-present threat of deportation.

6          28.    DACA allows people who were brought to the United States as children and who

7   meet certain criteria to apply for temporary deferral of deportation ("deferred action") and for work

8   authorization.  According to USCIS, as of March 31, 2017, approximately 800,000 young people

9   had been granted deferred action under DACA in the five years the program had been in place.  As

10  of March 31, 2020, there were 639,850 current DACA recipients.  There are currently an estimated

11  1,326,000 individuals who would be eligible to apply for DACA under the program's original terms.

12  Of those, an estimated 56,000 individuals became eligible for DACA since Defendants' unlawful

13  rescission in 2017.

14         29.    Under the DACA program's original terms, applicants are eligible for deferred action

15  under DACA only if they: (i) were under the age of 31 on June 15, 2012; (ii) were brought to the

16  United States before their 16th birthday; (iii) have continuously resided in the United States since

17  June 15, 2007; (iv) were physically present in the United States on June 15, 2012, and at the time

18  they made their DACA application; (v) did not have lawful immigration status on June 15, 2012; (vi)

19  are currently in school, have graduated or obtained a GED, or were honorably discharged from the

20  United States military or Coast Guard; and (vii) have not been convicted of a felony, significant

21  misdemeanor, or three or more misdemeanors, and do not pose a threat to national security or public

22  safety.

23         30.    To apply for deferred action under DACA, applicants were required to pay a

24  substantial fee of $495, submit a detailed application, and submit to a background check and any

25  other screening that DHS deems necessary.

26         31.    Pursuant to the program's original terms, deferred action and related work

27  authorizations were granted for two-year periods.  From the time DACA was first implemented,

28  applicants were told that they would have the opportunity to apply for renewal of deferred action and

were given detailed instructions for doing so.  In particular, recipients were instructed that they should apply for renewal approximately 120 days (but no more than 150 days) before the expiration of their two-year period.  Recipients were told that they would be eligible for renewal if they met the requirements for an initial DACA application and also: (i) had not departed the United States on or after June 15, 2007; (ii) had continuously resided in the United States since submission of their most recent DACA application; and (iii) had not in the interim been convicted of a disqualifying crime or otherwise posed a threat to national security or public safety.  The opportunity to renew is a crucial aspect of the DACA program.  There is little reason for eligible individuals to run the risk of identifying their immigration status for a temporary benefit, and there is little reason for employers such as the County to take the time and resources to hire and train DACA recipients who have received work authorization unless there is some assurance that those individuals will be eligible to renew that authorization.

32.     Defendants solicited extensive information from applicants for DACA, including names, addresses, birthdates, country of origin, and educational and criminal history.  By issuing an open invitation to apply for DACA, the government asked undocumented immigrants to take a leap of faith and identify themselves and, indirectly, their families to the federal government and acknowledge their undocumented status.  To assuage fears about disclosing this and other sensitive information, Defendants expressly promised that the information provided by DACA applicants would not be used against them or their families for immigration enforcement purposes, except in narrow, specified circumstances that would not normally apply to individuals eligible for DACA.

33.     The DACA program has been tremendously successful, creating much-needed stability for DACA recipients, their families, and their communities, and resulting in extensive benefits to all of these groups.  Under DACA, law-abiding, long-term U.S. residents who lack legal immigration status have access to better jobs and improved working conditions.  Because undocumented immigrants who lack work authorization must seek jobs that minimize their risk of being identified and deported, they often do not work in jobs that best fit their education, skills, and abilities, or those that would maximize their earning potential.  *See* Patrick Oakford, Center for American Progress, *Administrative Action on Immigration Reform, The Fiscal Benefits of*

*Temporary Work Permits*, at 6 (September 2014), available at https://tinyurl.com/y24q7msf (last visited Nov. 2, 2020).  Making workers eligible to apply for deferred action and work permits allows them greater occupational mobility, enabling them to seek out a wider range of potential career opportunities.  Moreover, "[t]he interaction between our broken immigration system and employment and labor laws have made undocumented workers more susceptible to exploitation in the workplace, leading them to earn lower wages than they otherwise could." *Id.* at 5.  Eliminating the fear of retaliatory reporting of immigration violations and potential deportation allows these workers to better protect their own workplace rights and those of their co-workers, leading to higher real wages and fewer violations of employment and labor laws and regulations.

34.    Those who have received deferred action under DACA and related work authorization enjoy increased earning potential, producing a positive multiplier effect on local economies.  Fiscal Policy Institute, *President's Immigration Action Expected to Benefit Economy* (Nov. 21, 2014), available at http://bit.ly/1FbnS7q (last visited Nov. 2, 2020) (estimating that wages for those eligible for work authorization will increase by five to 10 percent); Oakford, *Administrative Action on Immigration Reform, The Fiscal Benefits of Temporary Work Permits*, at 3 ("Temporary work permits would increase the earnings of undocumented immigrants by about 8.5 percent as they are able to work legally and find jobs that match their skills.").  Indeed, the upward mobility afforded by DACA is apparent from the results of a national survey of 1,402 young adults who were approved for DACA through June 2013:

> Since receiving DACA, young adult immigrants have become more integrated into the nation's economic institutions.  Approximately 61% of DACA recipients surveyed have obtained a new job since receiving DACA.  Meanwhile, over half have opened their first bank account, and 38% have obtained their first credit card.

Roberto G. Gonzales and Veronica Terriquez, American Immigration Council, *How DACA is Impacting the Lives of Those who are now DACAmented: Preliminary Findings from the National UnDACAmented Research Project* (Aug. 15, 2013), available at https://tinyurl.com/yykybgnx (last visited Nov. 2, 2020).  In short, DACA created significant economic benefits for qualifying individuals and for the nation at large by permitting greater levels of contribution to the workforce

by educated individuals who previously had limited employment opportunities.

**The County's Employment Relationship with DACA Recipients**

35.     The County is one of the largest employers in the region, with more than 23,000 employees performing a vast array of functions to meet the needs of this diverse community.  One of the main ways in which the County has benefited from the DACA program is through its employment relationships with DACA recipients.  In particular, the County currently employs DACA recipients as full-time employees.  The County has expended significant resources, both time and money, in recruiting, hiring, and training these employees and relies on them to provide County services.  Because DACA recipients are under no obligation to identify themselves as such when they apply for a job, and they present the same form of work authorization card as other categories of immigrants, the County cannot determine with certainty the total number of DACA recipients it employs.

36.     As one example, DACA recipients are employed through the County's In-Home Supportive Services ("IHSS") program, which provides in-home care in the form of assistance with activities of daily living, to eligible aged, blind, and disabled individuals who would otherwise be unable to remain safely in their own homes.  The County's IHSS program is funded through a combination of federal, state, and county funds, and provides services to over 22,000 IHSS beneficiaries in Santa Clara County.

37.     The County also currently employs at least three DACA recipients who are alumni of the County's New Americans Fellowship Program.  This program provides a summer career development opportunity for DACA recipients in order to develop valuable professional skills and serve as ambassadors to the County of Santa Clara community.  The program is also intended to introduce DACA recipients to various aspects of local government work, and to provide opportunities for participants to gain the experience and skills necessary to ultimately work for local governments like the County.  Fellows receive a stipend and commit to working at least 20 hours per week, for a period of no less than 10 weeks, on a project-based fellowship under the supervision of a County Department, the County Office of Immigrant Relations, or a Member of the Board of Supervisors' Office.  The fellowship culminates in a final research project and presentation.

1  Examples of the types of projects on which fellows work include improving the relationships

2  between law enforcement and the immigrant community, and launching a countywide campaign to

3  promote financial literacy among immigrants and refugees.

4        38.     The County began the New Americans Fellowship Program in July 2017.  The

5  County has hosted 49 fellows over the past four summers.  Fourteen DACA recipients participated in

6  the fourth annual New Americans Fellowship Program, which began in June 2020.  Final research

7  projects for the 2020 Program included "Immigrant Students' Access to K-12 Education During

8  COVID-19," "COVID-19 Impacts on Immigrant Community," and "Culturally Competent Services

9  Provided to Immigrant Clients in Pre-Trial Process."  Three Program alumni who currently work for

10  the County assisted with the 2020 Program by, for example, hosting fellows at their County

11  Department sites and/or co-hosting workshops and events for the fellows.

12        39.     DACA recipients have special skills that make them especially valuable employees of

13  the County.  For example, over ninety-five percent of DACA recipients are bilingual.  The County

14  values this skill because it must employ a workforce that is able to meet residents' language needs to

15  ensure meaningful access to County services, programs, and benefits.  *See* County of Santa Clara,

16  Board Policy 3.58.  Indeed, forty-five percent of clients currently receiving health, financial, or

17  employment assistance through the County Department of Employment and Benefit Services speak a

18  primary language other than English.  Santa Clara Valley Medical Center, a public hospital owned

19  and operated by the County, is required by law to provide qualified interpreters to limited-English-

20  proficient individuals and relies on medical interpreters to satisfy that requirement.  It frequently

21  takes months to fill interpreter vacancies for the County's hospital and clinics, and the County has

22  had difficulty filling several open positions.  For example, it recently took Language Services for the

23  Santa Clara Health System ten months to complete the hiring process for a qualified interpreter.

24        40.     If the DACA recipients currently employed by the County were to lose their work

25  authorization, these valued employees would be unable to work for the County or, indeed, to work in

26  any legal capacity for any employer, public or private, within Santa Clara County or the United

27  States.  The County would be forced to expend significant resources to temporarily cover those

28  employees' responsibilities, conduct searches for replacements, and train new employees.  On

1   average, it takes the County nearly three months to fill a vacancy.  Nearly all County employees,

2   including Local 521 members, are covered by merit system rules and collective bargaining

3   agreements that protect them against arbitrary dismissal and other adverse employment actions, and

4   that include anti-discrimination provisions.  Despite these protections, County employment is

5   contingent on valid work authorization.

6   **Reliance on the DACA Program and the Federal Government's Representations**

7   41.   Trusting the federal government's representations about the program, hundreds of

8   thousands of young people from across the country have applied for and received deferred action

9   under DACA since the program was initiated in 2012.  The DACA program has changed the lives of

10  DACA recipients.  Prior to DACA, many law-abiding undocumented young people saw little

11  purpose to completing higher education because they would be unable to work legally upon

12  graduation.  DACA gave them the ability to attend college, work to earn money to pay for higher

13  education, and to utilize their degrees to attain high-skilled and higher-paid jobs.  It also gave them

14  access to health care, medical benefits, credit, and the opportunity to become more integrated into

15  their communities.  DACA gave these young people hope that a better life was possible, and allowed

16  them to emerge from the shadows of society to serve their communities, including through work for

17  government agencies like the County of Santa Clara.

18  42.   Loss of DACA and work authorization would be devastating for County workers who

19  depend on the DACA program to maintain employment, health insurance, and other benefits.

20  Indeed, several County employees who are DACA recipients desired to join as individual plaintiffs

21  in this litigation, but ultimately chose not to come forward out of fear that Defendants would

22  retaliate against them or their families.

23  43.   Shortening the renewal period from two years to one year will also result in a

24  significant reduction in the number of DACA recipients who are able to renew and thus maintain

25  both deferred action and work authorization.  As detailed in a recent survey of 1,760 DACA

26  recipients conducted by the Presidents' Alliance on Higher Education and Immigration and

27  TheDream.US, 62% of current DACA recipients surveyed responded that a one-year grant period

28  would constitute "a substantial barrier" to renewal.  Lora Adams et al., *Discouraging and Denying*

AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   *Renewals*, THEDREAM.US, PRESIDENTS' ALLIANCE ON HIGHER EDUCATION AND IMMIGRATION (Sept.

2   29, 2020) at 4.  Survey respondents cited as one barrier the increased legal fees and application fees

3   associated with filing for renewal twice as often.  *Id.* at 4–5.  Administrative backlog may also

4   interfere with DACA recipients' ability to timely renew.  For example, the survey found that eleven

5   percent of respondents received approval for their DACA renewal more than 150 days after they

6   applied.  *Id.* at 5. And USCIS currently estimates processing times for DACA applications and

7   renewals to range from eight to eleven months at certain service centers.  *Id.*  But DACA recipients

8   cannot try to avoid a lapse in work authorization by applying even earlier because the Edlow

9   Directive requires DHS staff to "generally reject DACA renewal requests received more than 150

10  days prior to the expiration of the DACA recipient's current DACA validity period."  This Catch-22

11  means that many DACA recipients may regularly experience lapses even if they timely apply,

12  leading to at least a temporary a loss of work authorization.

13      44.     The County has also relied on the government's representations concerning the

14  DACA program.  The County has expended significant time and financial resources in recruiting,

15  hiring, and training DACA recipients for various positions in County.  Those employees carry out

16  important functions in County government and make significant contributions in providing services

17  to County residents.  Shortening the renewal period under DACA from two years to one year will

18  harm the County in at least four ways.

19      45.     First, halving the work authorization period to one year threatens the significant

20  investments in recruiting, hiring, and training of DACA recipients that the County have made.  And

21  unfortunately, employers like the County have less incentive to take the time and effort to train

22  employees with shorter-term work authorizations, particularly if there is a possibility that some of

23  those authorizations may lapse despite employees' best efforts to timely renew.

24      46.     Second, the shorter renewal period also imposes additional administrative burdens on

25  the Employee Benefits Department of the Santa Clara County Services Agency.  The Employee

26  Benefits Department verifies employee I-9 Forms and work authorizations, tracks the expiration

27  dates of all employees' work authorizations, and follows up with employees to ensure the County

28  has active work authorizations on file.  Shortening the renewal period for DACA means that the

1   Employee Benefits Department will have to more frequently follow up with employees regarding

2   expiring work authorizations and more frequently process and verify I-9 Forms and update the

3   corresponding employee files.

4        47.   Third, because the halved renewal period will likely result in more lapses in deferred

5   action under DACA and loss of work authorizations, the Employee Benefits Department will need to

6   process more termination paperwork when former DACA recipients separate from the County and,

7   in turn, more new-hire paperwork when those employees are eventually replaced.

8        48.   Fourth, County Agencies and Departments may also incur the administrative burden

9   of terminating the employment of individuals whose work authorizations expire and in turn expend

10  resources in recruiting, hiring, and training their replacements.

11  **Other Benefits to the County from the DACA Program**

12       49.   Santa Clara County is home to Silicon Valley, where many of the country's leading

13  high-tech and Internet-based companies are located.  Technology companies based in the County,

14  including Apple and Google, employ tens of thousands of workers.  Similarly, health care providers,

15  including Kaiser Permanente, Stanford Hospital and Clinics, and the County's own hospitals and

16  clinics, employ additional tens of thousands.  Many of these organizations employ DACA recipients.

17  For example, Tim Cook, CEO of Apple, noted in 2017 that 250 Apple employees are "Dreamers," or

18  DACA recipients.  In 2019, Mr. Cook announced that that number had increased to 443 DACA

19  recipients.  Silicon Valley has long been reliant on the contributions of immigrants.  One study noted

20  that immigrants launched a quarter of all engineering and technology companies in the United States

21  from 1995 to 2005, Vivek Wadhwa et al., *America's New Immigrant Entrepreneurs: Part I*, Duke

22  Science, Tech. & Innovation Paper No. 23 (Jan. 4, 2007), available at

23  https://papers.ssrn.com/sol3/papers.cfm?abstract_id=990152## (last visited Nov. 2, 2020), and over

24  half of Silicon Valley start-ups in the same period count at least one immigrant as a key founder,

25  Richard T. Herman, Immigrant, Inc.: Why Immigrant Entrepreneurs Are Driving the New

26  Economy (and how they will save the American worker) 5 (2009).

27       50.   In 2016, the Migration Policy Institute (MPI) estimated that there were 23,000

28  DACA-eligible individuals in Santa Clara County, including 15,000 who were immediately eligible.

1   MPI, Deferred Action for Childhood Arrivals Data Tools, available at

2   http://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles

3   (last visited Nov. 2, 2020).  According to MPI's estimates, Santa Clara County has the twelfth

4   largest DACA-eligible population among counties nationwide, and the largest DACA-eligible

5   population of all northern California counties.  MPI, National and County Estimates of Populations

6   Eligible for Deferred Action for Childhood Arrivals Program, 2016, available at:

7   http://www.migrationpolicy.org/sites/default/files/datahub/State-County-DACA-Estimates.xlsx (last

8   visited Nov. 2, 2020).

9        51.      In September 2017, ninety-one percent of DACA recipients were employed.  John W.

10   Schoen, *DACA Deportations Could Cost US Economy More than $400 Billion*, CNBC.com (Sept. 5,

11   2017), available at https://tinyurl.com/y7xnpfpg (last visited Nov. 2, 2020).  It is estimated that if

12   DACA recipients lose the ability to work legally, California alone would suffer a GDP loss of

13   approximately $11.3 billion a year.  *Id.*  As one of the counties with the largest number of DACA

14   recipients, much of this negative economic effect will be felt in Santa Clara County.

15        52.      Moreover, because they are able to work legally, DACA recipients are employed in

16   more highly compensated jobs and contribute more in state and local taxes than they would without

17   DACA.  One 2017 study estimated that the 1.3 million young people immediately eligible for

18   DACA contribute $2 billion a year in state and local taxes.  Institute on Taxation and Economic

19   Policy, *State & Local Tax Contributions of Young Undocumented Immigrants* (Apr. 25, 2017),

20   available at https://tinyurl.com/y7ohqagb (last visited Nov. 2, 2020).  Indeed, "DACA-eligible

21   individuals pay on average 8.9 percent of their income in state and local taxes.  Their effective tax

22   rate is higher than the average rate paid by the top 1% of taxpayers in state and local taxes . . . ."  *Id.*

23   "Repealing the temporary legal status and work authorizations permitted by DACA would reduce

24   estimated state and local revenues by nearly $800 million . . . ."  *Id.*  The same study estimated that

25   DACA eligible individuals contribute more than $530 million in state and local taxes in California

26   alone and, because Santa Clara County has a large number of DACA-eligible residents, the County

27   stands to lose significant tax revenue because of the "interim" modifications to DACA.

28        53.      In addition to its broad negative effects on the County's economy and fisc, the

16

"interim" modifications to DACA will make it more difficult and expensive for the County to provide services to its residents.  It is all the more critical that the County be able to provide key services, such as health care and public health services, to all residents during the current COVID-19 pandemic.  For example, DACA recipients who do not have employer-sponsored insurance and who satisfy income-eligibility requirements qualify for "full-scope" coverage under Medi-Cal, California's Medicaid program.  Through Medi-Cal, DACA recipients receive coverage for a core set of health benefits, including preventative care, doctor's visits, immunizations, prescriptions, and mental health and substance abuse services.  If these individuals lose deferred action, many of them will be eligible only for very limited Medi-Cal coverage of emergency and pregnancy-related services, increasing their reliance on other safety-net health care services provided by the County.

54.     The County operates the County of Santa Clara Health System, which is the only public safety-net health care provider in Santa Clara County and the second largest such provider in the State of California.  The Health System includes, among other things, the Santa Clara Valley Medical Center ("SCVMC"), a Level I trauma hospital; O'Connor Hospital; St. Louise Hospital; and a network of clinics—all of which provide critical health care services to poor and uninsured County residents.  Payments from these patients and from public insurance programs such as Medi-Cal do not cover the costs of services they receive through the County Health System.  As a result, each year the County provides a substantial subsidy to cover deficits incurred in serving the Health System's patients.  During the first three quarters of Fiscal Year 2017, SCVMC operated at a deficit of well over $90 million.  During Fiscal Year 2020, the Health System required over $198 million in County General Fund subsidy to maintain operations for that year.  Restriction of the DACA program will negatively affect the County Health System, and likely increase its operational deficit.  Because DACA recipients who are now employed pursuant to work authorization granted under the program may lose their work authorization and their jobs as well as their employer-sponsored health insurance, former DACA recipients, and family members who were covered by the recipient's insurance, are more likely to fall back on safety-net providers like the Health System.  Additionally, lacking employer-sponsored health insurance, potentially unable to access full-scope Medi-Cal, and burdened with a fear of detention and deportation, these individuals are less likely to obtain regular

check-ups and routine, preventative care.  As a result, they will be more likely to seek medical care only when health problems worsen—often at the Health System's Emergency Departments—at which point care becomes more difficult and more expensive.  Gutting key components of the DACA program—such as accepting new applications and granting a two-year renewal period—will increase the County's costs in subsidizing free and below-cost care through its Health System.

55.     In addition to health care, the County provides (and is often required to provide) many other services to community members regardless of immigration status, and it will become more difficult to provide these services to DACA recipients if they lose deferred action because of their renewed hesitancy to interact with the government for fear of detention and deportation.  At the same time, it will be even more critical for individuals who lose DACA to access County services— and the County will need to spend more to support them—because the same individuals will be losing work authorization and, thus, the ability to work legally to support themselves and their families.

56.     For example, the County invests significant resources in programs to provide housing to the homeless and to prevent homelessness.  In Fiscal Year 2015, the County allocated over $73.8 million in resources to housing and related services countywide and, in 2015, the Board of Supervisors approved increasing these expenditures by a total of $33.9 million over Fiscal Years 2016–2018.  For Fiscal Year 2021, the County allocated to housing and related services $316.4 million, including $116.2 million from an affordable housing bond.  In addition to providing housing to homeless individuals and families who utilize other County services, the County also funds homelessness prevention and emergency housing programs, including homeless shelters, a cold weather shelter program, interim housing for the chronically homeless, and 24-hour care shelter placements.  DACA recipients are less likely to rely on these County and/or other services because they can work legally and provide for their families.  If DACA recipients are no longer able to work legally, they may be more likely to rely on County and/or other services.  And individuals who would have been eligible to apply for DACA and receive work authorization but for the Wolf Memorandum's "interim" modifications likewise may more be more likely to rely on these services.

57.     The DACA program also reduces reliance on the County's safety-net services by

1   keeping families together.  Twenty-five percent of DACA recipients have at least one U.S.-born

2   child.  Dara Lind, *9 facts that explain DACA, the immigration program Trump is threatening to end*,

3   Vox.com (Sept. 5, 2017), available at https://tinyurl.com/y8eweo2h (last visited Nov. 2, 2020).  If

4   these parents are subject to deportation without DACA, some of their U.S. citizen children may enter

5   the foster care system.  The County provides financial support to foster parents to meet the basic

6   needs of foster youth placed in their care.  In the 2017 Fiscal Year, the County invested $25 million

7   in foster care youth, and the Wolf Memorandum's limitations on the DACA program could bring

8   more young people into the system, increasing costs and placing greater strains on County resources.

9          58.      Modifying key components of the DACA program, even on an "interim" basis, would

10  also hinder the County's ability to protect the public health and the safety of its residents.  The

11  County's Public Health Department ("PHD") runs numerous programs that protect the health not

12  only of the individual served, but of the wider community.  PHD provides immunization clinics,

13  tuberculosis testing, STD testing, COVID-19 testing, and other services that prevent the spread of

14  communicable diseases.  DACA has improved PHD's ability to provide these critical services to

15  immigrant communities by alleviating the fear of deportation that often prevents undocumented

16  immigrants from seeking government services.

17         59.      Trust between immigrant communities and public health officials is especially critical

18  during the current COVID-19 pandemic.  Crowded and multi-generation housing, employment as

19  essential workers, and hesitancy to seek government services can contribute to high rates of COVID-

20  19 transmission among immigrant communities in the County.  PHD has partnered with numerous

21  community organizations in the County to build trust with immigrant populations and ensure access

22  to COVID-19 testing and other critical services during the pandemic.  For example, contact tracing

23  is a key public health program that helps slow the spread of infectious disease like COVID-19.  PHD

24  workers and other government employees serving as contact tracers will interview someone who

25  tests positive for COVID-19 in order to determine who they have recently been in contact with and

26  notify those contacts that they may have been exposed, should get tested for COVID-19, and then

27  isolate themselves for a period of time.  Contact tracers must gain the trust of whomever they

28  interview because they may ask for personal information like name, age, address, contact

1    information, places the person recently visited, and people the person recently spent time with.

2    Because participation in contact tracing efforts is voluntary, it is imperative that immigrant

3    communities trust the public health workers, including those from PHD.

4         60.    If DACA recipients lose deferred action, they—and their U.S. citizen children—may

5    be less likely to receive necessary immunizations and testing or participate in key public health

6    measures, such as contact tracing, during the COVID-19 pandemic, thereby increasing health risks

7    for the community as a whole.  And individuals who would have been eligible to apply for DACA

8    but for the Wolf Memorandum's unlawful "interim" modifications likewise may be less likely to risk

9    revealing their lack of immigration status and receive necessary services from PHD.

10        61.    For similar reasons, DACA has had a positive effect on the relationship between

11   immigrant communities and local law enforcement.  Because of a justified fear of detention and

12   deportation, undocumented individuals are often hesitant to contact law enforcement even when they

13   are victims of crimes.  By providing an assurance that they are protected from immigration

14   enforcement actions, DACA has permitted recipients to be more willing to report crimes, act as

15   witnesses, and otherwise cooperate with local law enforcement, as well as with other emergency

16   services and first responders.  This improved relationship is invaluable not just to DACA recipients

17   themselves, but also to their communities and the County

18        62.    DACA has had a similar effect on the County's Code Enforcement Division, which

19   enforces zoning and building ordinances to ensure safe living conditions for Santa Clara County

20   residents.  The County has received reports that some tenants are reluctant to come forward with

21   reports of code violations because landlords have threatened to report immigrants to ICE.  DACA

22   substantially reduces that threat, thereby helping the County ensure that unsafe or unsanitary housing

23   conditions are abated for the safety and benefit of the entire community.

24        63.    DACA's benefits to the County are also evidenced by the County's willingness to

25   invest in DACA recipients.

26        64.    The County has allocated on an annual basis at least $200,000 to the New Americans

27   Fellowship Program, described above.

28        65.    In addition, in Fiscal Year 2017, the County allocated $200,000 for outreach and

AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  education concerning the DACA program, to ensure that eligible County residents know of and have

2  support necessary to apply for DACA.  In Fiscal Year 2019, the County allocated another $200,000

3  to five agencies that specifically provide DACA-related services.

4       66.    The County has invested in DACA recipients beyond these annual allocations.  For

5  example, just after Defendants announced that DACA would be rescinded in 2017, the County

6  allocated an additional $200,000 from its emergency reserve to establish an emergency program to

7  help DACA recipients submit renewal applications before the Administration's arbitrary October 5,

8  2017 deadline.  Using these funds, a total of 453 DACA recipients received scholarship grants in

9  order to pay their renewal application fees.  The County has continued this financial support for

10  renewal applications, executing in 2019 a $200,000 grant agreement with the Santa Clara County

11  DACA Collaborative to administer funding for DACA scholarships to pay for renewal application

12  fees.  Between January and May 2020, this County funding supported 405 scholarships to pay the

13  $495 renewal application fee for 405 low-income DACA recipients, including some who lost their

14  employment as a result of the COVID-19 pandemic.  In Fiscal Year 2020, County funding also

15  supported the provision of free legal services for 916 DACA recipients who were able to apply for

16  and receive DACA renewal.  With renewals occurring each year instead of every two, demand for

17  these types of assistance will only increase.

18       67.    In light of the many ways that the County has benefited from the DACA program, on

19  August 15, 2017, the County's Board of Supervisors unanimously adopted a resolution affirming its

20  support for the DACA program and its commitment to immigrant youth and young adults.

21  **The Administration's 2017 Attempt to Rescind the DACA Program**

22       68.    On September 5, 2017—more than five years after DHS encouraged individuals to

23  come out of the shadows and apply for DACA, and despite the program's success—then-Acting

24  Secretary Elaine Duke issued a memorandum formally rescinding DACA ("Duke Memorandum").

25  The Duke Memorandum stated that DHS would not consider any initial DACA applications received

26  after September 5, 2017.  As for then-current DACA recipients, the Duke Memorandum stated that

27  DHS would adjudicate pending renewal requests properly filed and accepted by DHS as of

28  September 5, 2017, and renewal requests properly filed and accepted by DHS by October 5, 2017

1    from individuals whose DACA benefits would expire between September 5, 2017 and March 5,

2    2018.  All other DACA renewal requests, including any requests received after October 5, 2017,

3    would be rejected.

4         69.    Former Acting Secretary Duke's memorandum did not explain the Administration's

5    reasons for departing from prior agency statements regarding the DACA program and rescinding the

6    program.  In its single explanatory paragraph, the Duke Memorandum gave no indication that DHS

7    had considered the benefits of the program, or the reliance interests of DACA recipients, their

8    families, communities, or employers, before abruptly ending it.  Rather, it simply referred to the

9    then-Attorney General's conclusion that the DACA program was unlawful, explaining that the Fifth

10   Circuit had held *different* programs (Deferred Action for the Parents of Americans and Lawful

11   Permanent Residents ("DAPA") and an expansion of the DACA) to be unlawful, and that this

12   decision had been affirmed by an equally divided Supreme Court.  The Duke Memorandum cited a

13   September 4, 2017 letter from the then-Attorney General, which provided no legal analysis

14   whatsoever and simply concluded that "it is likely that potentially imminent litigation would yield

15   similar results with respect to DACA."  The Duke Memorandum also did not indicate that the Acting

16   Secretary had given any consideration to measures that would have addressed the Attorney

17   General's legal concerns without completely rescinding the program.

18        70.    Pursuant to the Duke Memorandum, the federal government announced that it would

19   limit renewals for those DACA recipients whose benefits were set to expire before March 5, 2018,

20   provided they applied for renewal by October 5, 2017.  DHS immediately stopped accepting all new

21   applications under DACA.

22        71.    In January 2018, this Court entered a preliminary injunction requiring DHS to

23   continue processing renewal applications.  *See Regents of the Univ. of Cal. v. U.S. Dep't of*

24   *Homeland Sec.* ("*Regents I*"), 279 F. Supp. 3d 1011 (N.D. Cal. 2018).  The U.S. Court of Appeals

25   for the Ninth Circuit affirmed this Court's preliminary injunction in November 2018.  *See Regents of*

26   *the Univ. of Cal. U.S. Dep't of Homeland Sec.* ("*Regents II*"), 908 F.3d 476 (9th Cir. 2018).  The

27   federal government petitioned for certiorari, and the Supreme Court granted that petition along with

28   the federal government's petitions for certiorari in parallel litigation in the U.S. District Court for the

District of Columbia and the U.S. District Court for the Eastern District of New York.

72.     On June 18, 2020, the Supreme Court held that the Duke Memorandum rescinding DACA was unlawful, arbitrary, and capricious under the Administrative Procedure Act.  *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.* ("*Regents III*"), 140 S. Ct. 1891 (2020).  The Supreme Court concluded that the Duke Memorandum had failed to address the reliance interests of DACA recipients, their communities, and their employers, *id.* at 1915–16, and had failed to adequately consider or explain the decision to terminate the deferred action aspect of the DACA program rather than only the program's work authorization and other benefits, *id.* at 1910–15.  The Supreme Court expressly affirmed in full the U.S. District Court for the District of Columbia's vacatur of the rescission of the DACA program.  *Id.* at 1916 & n.17 (affirming summary judgment ruling in *NAACP v. Trump*, 315 F. Supp. 3d 457 (D.D.C. 2018)); *see also NAACP*, 315 F. Supp. 3d at 473 (holding that DACA's rescission was unlawful and must be set aside).

73.     Shortly thereafter, the Supreme Court denied the federal government's pending petition for certiorari from a U.S. Court of Appeals for the Fourth Circuit ruling, which likewise set aside the 2017 Duke Memorandum as arbitrary and capricious under the APA.  *See Casa de Md. v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 706 (4th Cir. 2019), *cert. denied* 2020 WL 3492650 (Mem.) (U.S. June 29, 2020) (No. 18-1469).

74.     On June 30, 2020, the Fourth Circuit issued the mandate associated with its ruling.  *See* Mandate, *Casa de Md.*, 18-1521, ECF No. 71 (4th Cir. June 30, 2020).  The effect of this mandate was to vacate the 2017 Duke Memorandum rescinding DACA, to the extent it had not already been vacated by the U.S. Supreme Court's *Regents III* decision.

**The Administration's 2020 "Interim" Modifications to the DACA Program**

75.     Following the Supreme Court's decision in *Regents III*, DHS was required to return to the *status quo ante*, restore the DACA program to its original terms, and resume processing applications including from those who had aged into eligibility for the program during the pendency of the unlawful Duke Memorandum.  DHS did not.  Instead, it unlawfully "generally held" initial DACA applications and requests for advance parole "in anticipation of potential policy changes."  *See* Mem. from Chad F. Wolf, Acting Sec'y of Homeland Security, to Mark Morgan, Senior Official

1  Performing the Duties of Comm'r, U.S. Customs and Border Protection, et al., *Reconsideration of*

2  *the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to*

3  *Individuals Who Came to the United States as Children"* (July 28, 2020) ("Wolf Memorandum").

4       76.     Those policy changes came approximately six weeks after the *Regents III* opinion.

5  The Wolf Memorandum, issued on July 28, 2020, announces that Defendant Wolf is "considering

6  anew the DACA policy." *Id.* at 4.  The Wolf Memorandum "rescind[s] the Nielsen Memorandum

7  and the Duke Memorandum, and mak[es] certain immediate changes to the DACA policy to mitigate

8  [Defendant Wolf's] enforcement policy concerns while [he] conduct[s] a full and careful

9  consideration of the full rescission." *Id.*  The Wolf Memorandum directs DHS to make three

10 "immediate changes":  to reject all new initial applications, to reject all advance parole applications

11 absent "exceptional circumstances," and to halve the renewal period for current DACA recipients

12 from two years to one year. *Id.* at 7–8.  The Wolf Memorandum unlawfully applies these changes

13 retroactively to all applications submitted after the Supreme Court's June 18, 2020 *Regents III*

14 decision. *Id.* at 7.

15      77.     As justification, the Wolf Memorandum alludes to "significant questions of law and

16 legal policy," but does not elaborate further on those questions of law. *Id.* at 4.  Instead, Defendant

17 Wolf focuses on several "serious policy concerns that may warrant [the DACA program's] full

18 rescission." *Id.*  He cites four enforcement policy concerns, none of which provides a reasoned basis

19 for the "interim" modifications his Memorandum imposes.  First, Defendant Wolf states that the

20 DACA program was intended as a temporary "stopgap measure" while Congress considered various

21 proposals for the individuals covered by the program. *Id.* at 4–5.  He hypothesizes that "rescinding

22 DACA entirely may well create a more pressing need for Congress" to enact immigration reform.

23 *Id.*  Even assuming that using the DACA program as a political pawn to pressure another branch of

24 government to enact immigration reform were a legitimate rationale, the Wolf Memorandum fails to

25 explain how its "interim" measures may spur legislative action.  Second, he expresses general

26 concerns about general policies of non-enforcement. *Id.* at 5.  Third, and relatedly, he expresses

27 concern that DHS may be sending "mixed messages" about the agency's "intention to consistently

28 enforce the immigration laws as Congress has written them." *Id.*  And fourth, he guesses that

1  "rescinding the DACA policy"—which he concedes "would not apply to children who are sent or

2  brought to this country today"—"may further DHS's efforts to discourage illegal immigration

3  involving children going forward."  *Id.*  The Memorandum provides no indication that Defendant

4  Wolf relied on any evidence demonstrating that the DACA program has had any impact on rates of

5  migration of children and again provides no explanation of how its chosen policy changes, such as

6  halving the renewal period, mitigates this policy concern.

7       78.    The Wolf Memorandum minimizes the reliance interests engendered by the DACA

8  program.  It asserts, for example, that reliance interests are not "significantly affected" by halving

9  the renewal period because this change could potentially lessen the impact should Defendant Wolf

10 ultimately rescind DACA in full.  *Id.* at 6.  The Memorandum likewise dismisses the reliance

11 interests of individuals who would be eligible to apply for deferred action under DACA but for the

12 Memorandum's prohibition on new applications.  The Memorandum says it "makes sense" to

13 "continue" the "status quo for more than two years" of not processing new DACA applications, but

14 completely ignores that this was the "status quo" only because of Defendants' unlawful rescission in

15 2017.  Under the Supreme Court's *Regents III* decision, DHS was required to return to the *status quo*

16 *ante* before the unlawful rescission and begin processing anew initial DACA applications.

17      79.    On August 21, 2020, Defendant Edlow, the purported Deputy Director of Policy of

18 Defendant USCIS, issued a policy directive purporting to implement the Wolf Memorandum,

19 instructing USCIS officials to take the actions directed by the Wolf Memorandum.  Mem. from

20 Joseph Edlow, Deputy Dir. For Pol'y, to Assoc. Dirs. And Program Off. Chiefs, *Implementing*

21 *Acting Secretary Chad Wolf's July 28, 2020 Memorandum, "Reconsideration of the June 15, 2012*

22 *Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the*

23 *United States as Children'"* (Aug. 21, 2020) ("Edlow Directive").  In addition, the Edlow Directive

24 directs USCIS staff to "generally reject DACA renewal requests received more than 150 days prior

25 the expiration of the DACA recipient's current DACA validity period."  *Id.* at 3–4.

26 **The Unlawful Designation of Defendant Wolf as Acting Secretary of Homeland Security and**

27 **Defendant Edlow as Deputy Director of Policy of USCIS**

28      80.    At the time he issued the Wolf Memorandum, and continuing to this date, Defendant

1  Wolf was unlawfully serving as Acting Secretary of Homeland Security and lacked authority to

2  exercise the powers of the office of the Secretary.

3      81.    There has been no Senate-confirmed Secretary of Homeland Security since April 10,

4  2019, when former Secretary Kirstjen Nielsen resigned.  Upon Nielsen's resignation, then-Customs

5  and Border Patrol ("CBP") Commissioner Kevin McAleenan assumed the office of Acting

6  Secretary.  His appointment contravened the order of succession previously designated by the

7  Secretary under the Homeland Security Act.  Nonetheless, McAleenan purported to exercise the

8  Acting Secretary's powers, including, among other things, to amend the designated order of

9  succession.  When McAleenan resigned on November 13, 2019, Defendant Wolf purported to take

10  office as Acting Secretary of Homeland Secretary pursuant to McAleenan's amendment to the

11  succession order.

12      82.    Defendant Wolf's tenure as Acting Secretary of Homeland Security is contrary to the

13  Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3345 *et seq.*, the Homeland Security Act

14  ("HSA"), 6 U.S.C. § 101 *et seq.*, and the Appointments Clause, for three primary and independent

15  reasons.  First, Defendant Wolf's predecessor, McAleenan, was not the lawful successor to former

16  Secretary Nielsen, and therefore lacked the authority to amend DHS's order of succession and make

17  Defendant Wolf next in line to serve as Acting Secretary.  Because McAleenan's amendment to the

18  order of succession was performed without lawful authority under the HSA or the FVRA, it had "no

19  force and effect," 5 U.S.C. § 3348(d)(1), and also must be set aside as in excess of statutory

20  authority, 5 U.S.C. § 706(2).  This means that Defendant Wolf's accession to the role of Acting

21  Secretary based on McAleenan's amendment was likewise unlawful.  Second, because more than

22  210 days had passed since former Secretary Nielsen's resignation, the office of the Secretary was

23  required to "remain vacant" until the President submitted a new nominee for Senate confirmation.

24  *Id.* §§ 3346, 3347(b)(1).  Third, beyond statutory requirements, Defendant Wolf's unreasonably long

25  service in the role of Acting Secretary and appointment to that role by another inferior officer

26  violated the Appointments Clause.  As a result of each of these legal infirmities, Defendant Wolf

27  lacked the authority to issue his Memorandum rescinding key components of the DACA program.

28  *//*

AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

*The Federal Vacancies Reform Act and the Homeland Security Act*

83.     Two federal statutes govern the order of succession for Acting Secretary of Homeland Security: the FVRA, 5 U.S.C. § 3345 *et seq.*, and HSA, 6 U.S.C. § 101 *et seq.*

84.     In addition, both the HSA and the Appointments Clause of the U.S. Constitution require the Secretary of Homeland Security to be appointed by the President with the advice and consent of the Senate.  *See* 6 U.S.C. § 112(a)(1); *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1657 (2020) (Heads of Departments are principal officers subject to the Appointments Clause).

85.     Under the Appointments Clause of the U.S. Constitution, the President "shall nominate, and by and with Advice and Consent of the Senate, shall appoint . . . Officers, of the United States."  U.S. Const., art. II, § 2, cl. 2.  Offices requiring Presidential appointment and Senate confirmation ("PAS offices") wield critical power in the federal government.  The advice-and-consent requirement therefore represents a "significant structural safeguard[] of the constitutional scheme."  *Edmond v. United States*, 520 U.S. 651, 659 (1997).

86.     The FVRA establishes a default framework for temporarily filling vacant PAS offices.  Under the FVRA, the "first assistant to the officer" of a vacant office becomes the acting official by default, 5 U.S.C. § 3345(a)(1), unless the President appoints someone who already serves in a different Senate-confirmed position or authorizes an officer or employee of the relevant agency if they satisfy certain other conditions, *id.* §§ 3345(a)(2), (a)(3).

87.     The FVRA framework is the "exclusive means" for authorizing acting officials unless, as relevant here, an agency-specific statute expressly designates the succession order or authorizes the President, a court, or head of an Executive department to designate the succession order.  *Id.* §§ 3347(a)(1)(A), (a)(1)(B).

88.     The HSA is such an agency-specific statute because it establishes an order of succession for the position of Acting Secretary of Homeland Security.  6 U.S.C. § 113(g).  Under 6 U.S.C. § 113(a)(1)(A), the Deputy Secretary of Homeland Security is the "first assistant" to the Secretary for purposes of the FVRA and automatically assumes her office if it is vacant.  Under 6 U.S.C. § 113(g)(1), the Under Secretary for Management of the Department of Homeland Security

1   assumes the office of Acting Secretary in the event neither the Secretary nor the Deputy Secretary is

2   available to exercise the functions and duties of the Secretary.

3       89.     The HSA authorizes the Secretary to designate a further order of succession in the

4   event that neither the Secretary nor the Deputy Secretary nor the Under Secretary for Management is

5   available to exercise the functions and duties of the Secretary.  *Id.* § 113(g)(2).

6       90.     Regardless of the method by which an acting official assumes office, a vacant office

7   may not be occupied by acting officials "for longer than 210 days beginning on the day the vacancy

8   occurs."  5 U.S.C. § 3346(a).  And a person who has been nominated to permanently hold that

9   position may not serve as an acting officer, except under specified circumstances not applicable here.

10  *Id.* § 3345(b)(1)(B).

11      91.     Unless an officer is performing the functions and duties of the vacant office

12  consistent with the FVRA or an agency-specific statute as authorized by section 3347 of the FVRA,

13  "the office shall remain vacant."  5 U.S.C. § 3348(b)(1).

14      92.     An agency action taken by an unlawfully serving acting official in the performance of

15  a "function or duty" of the vacant office "shall have no force and effect" and "may not be ratified."

16  *Id.* §§ 3348(d)(1), (d)(2).  A "function or duty" is any function or duty that is established by statute

17  or regulation that is required by statute or regulation "to be performed by the applicable officer (and

18  only that officer)."  *Id.* § 3348(a)(2).

19      93.     Establishing national immigration enforcement policies and priorities is a function of

20  the Secretary of Homeland Security.  6 U.S.C. § 202(5).  Defendant Wolf relied on section 202 when

21  issuing the Wolf Memorandum, which purports to set enforcement priorities.  *See* Wolf

22  Memorandum at 4.

23          ***The DHS Succession Order***

24      94.     Since December 2016, the further order of succession for the Secretary of Homeland

25  Security under the HSA has been governed by Executive Order 13753 and DHS Delegation Number

26  00106 ("Directive 00106"), issued by then-Secretary Jeh Johnson.  Together, these documents set

27  forth two orders of succession depending on the reason the Secretary is unavailable.

28      95.     Executive Order 13753, issued pursuant to the President's authority under section

AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

3345 of the FVRA, designated the order of DHS officials who would become Acting Secretary "during any period in which the Secretary has died, resigned, or otherwise become unable to perform the functions and duties of the office of Secretary."  Exec. Order 13753 § 1, Amending the Order of Succession in the Department of Homeland Security, 81 Fed. Reg. 90,667, 90,667 (Dec. 9, 2016). Section II.A of Directive 00106 adopted the order of succession laid out in Executive Order 13753 "[i]n case of the Secretary's death, resignation, or inability to perform the functions of the Office." Section II.B of Directive 00106, by contrast, set forth a separate order of succession for a different set of circumstances: when the Secretary becomes "unavailable to act during a disaster or catastrophic emergency."  Annex A to the Directive set forth this alternative order of succession under Section II.B.  In other words, there were two separate orders for the office of the Secretary of Homeland Security: one that applied when the Secretary had "died, resigned, or otherwise become unable to perform" her duties (Section II.A and Executive Order 13753) and one that applied when the Secretary was "unavailable to act during a disaster or catastrophic emergency" (Section II.B and Annex A).

96.     On April 7, 2019, then-Secretary Nielsen announced on Twitter that she had resigned office effective that day.  She later tweeted that day that she had agreed to stay on as Secretary through April 10 "to assist with an orderly transition."  On April 9, 2019, then-Secretary Nielsen signed a memorandum that amended Directive 00106 to replace Annex A's order referenced in Section II.B of Directive 00106, which applied only when the Secretary become unavailable due to an disaster or catastrophic emergency.  The Amendment to Annex A identified that document not as an "order of succession," but rather as an "order of delegation of authority."  The April 2019 memorandum did not, however, amend the language in Section II.A of Directive 00106, which applied when the Secretary died, resigned, or became unable to perform her functions.

97.     The effect of then-Secretary Nielsen's memorandum was to leave intact the separate orders of succession for the Secretary in case of her "death, resignation, or inability to perform the functions of the Office" and her "unavailab[ility] to act during a disaster or catastrophic emergency" respectively.  Thus, at the time she resigned on April 10, 2019, the relevant order of succession under Section II.A, which adopted Executive Order 13753, for the acting position was: Deputy

AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   Secretary, Under Secretary for Management, the Administrator of the Federal Emergency

2   Management Agency ("FEMA"), the Under Secretary for National Protection and Programs, the

3   Under Secretary for Science and Technology, the Under Secretary for Intelligence and Analysis, and

4   Commissioner of U.S. Customs and Border Protection.

5           98.     On April 10, 2019, four of the six offices in the line of succession when the

6   Secretary's office becomes vacant due to resignation were vacant (Deputy Secretary of Homeland

7   Security, Under Secretary for Management, FEMA Administrator, and Under Secretary for Science

8   and Technology).  Two offices in the line of succession were *not* vacant—the Under Secretary for

9   National Protection and Programs and the Under Secretary for Intelligence and Analysis—but

10  neither of the individuals holding these offices assumed the office of Acting Secretary.  Instead, CBP

11  Commissioner Kevin McAleenan assumed the office of Acting Secretary.  While the CBP

12  Commissioner would have been next in line to serve as Acting Secretary in the event of the

13  Secretary's unavailability "to act during a disaster or catastrophic emergency" under Section II.B of

14  Directive 00106 and Annex A, the CBP Commissioner was not next in line in case of death,

15  resignation, or inability to perform the functions of the office under Section II.A of Directive 00106.

16  Because the need for an Acting Secretary arose due to Secretary Nielsen's resignation,

17  Commissioner McAleenan's accession to the office of Acting Secretary was contrary to Directive

18  00106 and Executive Order 13753.

19          99.     On November 8, 2019 (212 days after Nielsen resigned), Commissioner McAleenan

20  issued an order in his purported capacity as Acting Secretary to further amend Directive 00106.

21  These amendments (1) provided that Annex A would also govern the order of succession in cases of

22  death, resignation, or inability to perform the functions of the office, and (2) replaced Annex A's

23  order of succession with a new one under which the CBP Commissioner would be third in line to

24  serve as Acting Secretary and the Under Secretary for Strategy, Policy, and Plans would be fourth in

25  line.  However, because Commissioner McAleenan was not the lawful Acting Secretary following

26  Secretary Nielsen's resignation, and also because the office of the Secretary had been vacant for

27  more than 210 days, he did not have lawful authority to amend the DHS order of succession.

28          100.    Defendant Wolf was confirmed as Under Secretary for Strategy, Policy, and Plans on

30

AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  November 13, 2019.

2       101.    Also on November 13, 2019 (217 days after Nielsen resigned), Commissioner

3  McAleenan resigned as Acting Secretary of Homeland Secretary.  Defendant Wolf purported to take

4  office as Acting Secretary of Homeland Secretary pursuant to Commissioner McAleenan's

5  November 8, 2019 amendments to Directive 00106.  Because Defendant Wolf's installation as

6  Acting Secretary was based on the amendments to the order of succession that McAleenan lacked

7  the authority to make, it was likewise unlawful.

8       102.    When Defendant Wolf appointed Defendant Edlow to the office of Deputy Director

9  of Policy of USCIS on February 19, 2020, the office of the Secretary had been vacant for 315 days.

10       103.    When Defendant Wolf issued the Wolf Memorandum on July 28, 2020, the office of

11  the Secretary had been vacant for 475 days and Defendant Wolf had been unlawfully serving as

12  Acting Secretary for 258 days.

13         ***The Government Accountability Office Concludes that Defendant Wolf Is Not Lawfully***

14         ***Serving as Acting Secretary***

15       104.    On November 15, 2019, the Chairman of the House Committee on Homeland

16  Security and the Acting Chairwoman of the House Committee on Oversight and Reform wrote the

17  United States Comptroller General, who is head of the United States Government Accountability

18  Office ("GAO").  Their letter expressed doubt that Commissioner McAleenan had lawfully assumed

19  office as Acting Secretary consistent with section 113(g) of the HSA, that Commissioner McAleenan

20  had lawfully amended Directive 00106 on November 8, 2019, and that Defendant Wolf had lawfully

21  succeeded Commissioner McAleenan as Acting Secretary pursuant to Directive 00106.

22       105.    On August 14, 2020, the GAO's General Counsel concluded that Defendant Wolf had

23  never lawfully served in the role of Acting Secretary because his assumption of that role—based on

24  amendments McAleenan had no authority to make—had violated the FVRA and HSA.  *See* U.S.

25  Gov't Accountability Office, B-3321650, Decision Letter on Legality of Service of Acting Secretary

26  of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of

27  Homeland Security (Aug. 14, 2020), available at https://www.gao.gov/assets/710/708830.pdf

28  ("GAO Opinion").  The GAO opinion did not address who instead should be serving as the Acting

1    Secretary and the "consequences of actions taken by" improperly serving officials, but referred these

2    questions to the DHS Inspector General.  *Id.* at 2 n.1

3    106.    DHS requested that the GAO reconsider and rescind its report, but the GAO denied

4    the request, concluding that DHS had not shown that the report contained any material errors of fact

5    or law.  *See* U.S. Gov't Accountability Office, B-332451, Decision Letter on Legality of Service of

6    Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of

7    Deputy Secretary of Homeland Security—Reconsideration (Aug. 21, 2020), available at

8    https://www.gao.gov/assets/710/708944.pdf; *see also* Office of the General Counsel, DHS, Letter to

9    Thomas A. Armstrong, General Counsel, GAO (Aug. 17, 2020), available at

10   https://www.dhs.gov/sites/default/files/publications/20_0817_ogc_gao-as1-succession-response.pdf.

11   ***Further Actions by the Department of Homeland Security***

12   107.    On August 25, 2020, President Trump announced on Twitter that he intended to

13   nominate Defendant Wolf as the permanent Secretary of Homeland Security.

14   108.    On September 10, 2020, President Trump formally nominated Defendant Wolf to be

15   Secretary of Homeland Security.

16   109.    Also on September 10, 2020, FEMA Administrator Peter T. Gaynor re-issued the

17   order of succession first issued by Commissioner McAleenan in November 2019.  Peter T. Gaynor,

18   *Order Designating the Order of Succession for the Secretary of Homeland Security* (Sept. 10, 2020)

19   ("Gaynor Order").  The Gaynor Order did not concede that the orders of succession issued by former

20   Secretary Nielsen and Commissioner McAleenan were unlawful, but acknowledged the GAO

21   Opinion's conclusion that "no Secretary has ever properly invoked 6 U.S.C. § 113(g)(2)" to issue a

22   "further order of succession."  According to the Gaynor Order, if that were the case, the FVRA

23   "would provide an alternative basis for an official to exercise the functions and duties of the

24   Secretary in an acting capacity," and under Executive Order 13753, the next-in-line official under

25   the FVRA would be the FEMA Administrator—Mr. Gaynor.  Exercising "any authority [he] may

26   have been granted by the FVRA," and "out of an abundance of caution," Mr. Gaynor re-issued

27   pursuant to § 113(g)(2) the same order of succession previously issued by Commissioner

28   McAleenan.  According to Mr. Gaynor, under his reissuance of the order of succession, Defendant

1    Wolf became Acting Secretary.

2        110.    Although the FVRA bars—subject to exceptions not applicable here—officials who

3    have been formally nominated for a position from serving in that role in an acting capacity, *see* 5

4    U.S.C. 3345(b)(1)(B), and President Trump formally nominated Defendant Wolf on September 10,

5    2020, Defendant Wolf has continued to claim to be Acting Secretary of Homeland Security.

6        111.    On September 17, 2020, Defendant Wolf issued a memorandum purporting to ratify

7    actions he took as Acting Secretary prior to the Gaynor Order.  *See* Ratification of Department

8    Actions, 89 Fed. Reg. 59651, 59652–54 (Sept. 23, 2020) ("First Ratification Memorandum").  Like

9    the Gaynor Order, the First Ratification Memorandum did not concede that Defendant Wolf's

10   service as Acting Secretary was unlawful, and instead affirmed that Defendant Wolf "remain[s] the

11   Acting Secretary notwithstanding [his] nomination" and the FVRA's time limits.  But "out of an

12   abundance of caution," the First Ratification Memorandum relied on "alternate scenario" set forth in

13   the Gaynor Order as another basis for Wolf's authority.

14       112.    The First Ratification Memorandum also asserted that the FVRA's prohibition on

15   nominees serving in an acting capacity during the pendency of the nomination does not apply to the

16   office of the Secretary under the HSA, and that Defendant Wolf's nomination "restarted the FVRA's

17   time limits" to the extent they applied to the office of the Secretary.

18       113.    The First Ratification Memorandum then purported to exercise the authority of the

19   Acting Secretary to "affirm and ratify any and all actions involving delegable duties" taken by

20   Defendant Wolf "from November 13, 2019, through September 10, 2020."

21       114.    Defendant Wolf issued another ratification memorandum on October 7, 2020, this

22   one purporting to ratify, among other actions, "one delegable action taken by U.S. Citizenship and

23   Immigration Services (USCIS) Deputy Directive for Policy Edlow," including the August 21, 2020

24   Edlow Directive.  *See* Ratification of Department Actions, 89 Fed. Reg. 65653, 65653–56 (Oct. 16,

25   2020) ("Second Ratification Memorandum").

26   //

27   //

28   //

**FIRST CLAIM FOR RELIEF**

**Violation of Administrative Procedure Act, 5 U.S.C. § 706**

**The Wolf Memorandum and the Edlow Directive**

115.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Amended Complaint.

116.    The Wolf Memorandum and Edlow Directive are final agency actions subject to judicial review under the APA.

117.    Under the APA, courts shall "hold unlawful and set aside" agency action "found to be arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law; contrary to a constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; without observance of procedure required by law."  5 U.S.C. § 706(2).

118.    The Wolf Memorandum is arbitrary and capricious, an abuse of discretion, contrary to law, and in excess of statutory authority.  Instead of reasoned explanation, the Wolf Memorandum is based on asserted policy justifications that are not supported by evidence and that are, in any event, untethered to the interim actions taken.  Some are also improper.  For example, the Wolf Memorandum effectively concedes that it is temporarily rescinding core components of the DACA program in order to spur congressional action on immigration reform.  But wielding DACA—a hugely successful program on which hundreds of thousands of DACA recipients, their families, and their communities—as a political pawn reveals the Wolf Memorandum's lack of reasoned justification.

119.    What is more, although the Wolf Memorandum and Edlow Directive have immediate consequences for Plaintiffs and numerous DACA recipients and DACA-eligible individuals, Defendants characterize their actions as an "interim" measure, effectively conceding that they did not conduct a full consideration of the contemplated changes as required by the APA and by the Supreme Court's *Regents III* decision.

120.    The Wolf Memorandum also fails to consider all the relevant factors, including those set out by the Supreme Court.  For example, the Memorandum fails to fully consider the reliance

AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    interests of those who have participated in or in other ways benefited from the DACA program or

2    the reliance interests of those who would be eligible to apply for DACA but for the Memorandum,

3    including those who the law required to be allowed to apply after the *Regents III* decision.  It also

4    fails to assess the arbitrariness or harms of applying its policies retroactively.

5         121.    In addition, the retroactive application of the Wolf Memorandum's new policies

6    violates the legal obligations imposed by the Supreme Court's *Regents III* decision and the Fourth

7    Circuit's mandate to return to the *status quo ante* before Defendants' unlawful rescission in 2017.

8         122.    Finally, the Wolf Memorandum was issued by an agency official who lacked legal

9    authority to do so because Defendant Wolf was not lawfully serving as Acting Secretary of

10   Homeland Security.  The Wolf Memorandum is thus contrary to law in violation of the Homeland

11   Security Act, Federal Vacancies Reform Act, and the Appointments Clause, and is invalid and void.

12        123.    The Edlow Directive is also arbitrary and capricious, an abuse of discretion, and

13   otherwise not in accordance with law because, among other reasons, it purports to implement the

14   unlawful Wolf Memorandum and unreasonably instructs USCIS staff to reject renewal applications

15   filed more than 150 days before the expiration of current DACA recipients' validity period even

16   though USCIS' current estimates of processing times for DACA applications far exceed 150 days.

17   In addition, the Directive was issued by an individual who did not have legal authority to do so:

18   Defendant Edlow was designated to serve in his position by Defendant Wolf, who was and still is

19   unlawfully serving as Acting Secretary of Homeland Security.

20        124.    The Wolf Memorandum and the Edlow Directive implementing it are therefore

21   arbitrary and capricious, contrary to law, and in excess of statutory authority in violation of 5 U.S.C.

22   § 706(2)(A) & (C), and must be held unlawful and set aside.

23        125.    The County, its employees, and its residents, and Local 521 and its members have

24   been harmed and continue to be harmed by these unlawful acts.

**SECOND CLAIM FOR RELIEF**

**Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq.*, and Homeland Security Act, 6 U.S.C.**

**§§ 112–13**

28        126.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this

1  Amended Complaint.

2      127.   The Secretary of Homeland Security must be appointed by the President with the

3  advice and consent of the Senate.  6 U.S.C. § 112(a)(1).

4      128.   When the office of the Secretary is vacant, only a valid Acting Secretary may perform

5  the functions or duties of the Secretary.

6      129.   Commissioner McAleenan lacked the authority to amend the order of succession

7  which purported to make Defendant Wolf next in line for Acting Secretary for at least three

8  independent reasons.

9      130.   First, Commissioner McAleenan improperly assumed the position of Acting Secretary

10  in violation of the order of succession under the HSA, 6 U.S.C. § 113(g)(2), and so was not lawfully

11  serving as Acting Secretary.

12      131.   Second, section 113(g)(2) of the HSA authorizes only the Secretary, not an *Acting*

13  Secretary, to establish a further order of succession to that office.  *See Nw. Immgr. Rts. Project v.*

14  *U.S. Citizenship & Immigr. Servs.*, No. 19-cv-03283-RDM, slip op. at 38–42, 52 (D.D.C. Oct. 8.

15  2020) (Moss, J.) ("The Court therefore concludes that 'Secretary' in § 113(g)(2) does not include an

16  Acting Secretary, but instead means the Secretary and only the Secretary.").

17      132.   And third, by the time Commissioner McAleenan purported to amend the DHS order

18  of succession, he had already been serving for longer than the FVRA's limit of 210 days.  *See* 5

19  U.S.C. § 3346(a).  Because the office of the Secretary had been vacant for more than 210 days, the

20  FVRA required that it "remain vacant" until the President submitted a nominee to the Senate.  *Id.*

21  § 3348(b)(1).

22      133.   Thus, for these reasons, Commissioner McAleenan amended the order of succession

23  without lawful authority, and his actions "have no force or effect."  5 U.S.C. § 3348(d)(1).  Because

24  Defendant Wolf assumed the position of Acting Secretary pursuant to Commissioner McAleenan's

25  unlawful amendments, his service in that role is unlawful under both the HSA and FVRA.

26      134.   Besides these defects in Commissioner McAleenan's authority, by the time

27  Defendant Wolf assumed the role of Acting Secretary on November 13, 2019, the office of the

28  Secretary had been vacant for 217 days, a week past the total 210 days an office can by occupied by

acting officials before it must remain vacant under the FVRA.  *See* 5 U.S.C. § 3346(a).  And by the time Defendant Wolf issued the Wolf Memorandum on July 28, 2020, the office of the Secretary had been vacant for 475 days and Defendant Wolf had been serving as Acting Secretary for 258 days. For these reasons as well, Defendant Wolf's assumption of the office and issuance of the Wolf Memorandum were unlawful.

135.    As a result of these separate and independent legal infirmities, Defendant Wolf was not lawfully serving as the Acting Secretary and did not have the legal authority to issue the Wolf Memorandum or appoint Defendant Edlow to serve as Deputy Director of Policy of USCIS.  In fact, at that time, no officer could perform the functions of Acting Secretary and no officer had legal authority to issue a memorandum even temporarily rescinding or modifying key components of the DACA program.

136.    Because the Wolf Memorandum was issued by an officer unlawfully serving as Acting Secretary, it "shall have no force and effect" and "may not be ratified."  5 U.S.C. §§ 3348(d)(1), (d)(2).  Defendant Wolf's First and Second Ratification Memoranda are therefore contrary to the plain terms of the FVRA and cannot remedy the legal defects of the Wolf Memorandum or the Edlow Directive.  Even if the plain text of the FVRA did not bar ratification, Defendant Wolf could not have issued his Ratification Memoranda because, as already explained, the office of the Secretary has been vacant for far more than 210 days and must "remain vacant," 5 U.S.C. § 3346(a); the FVRA prohibits nominees from serving in an acting capacity the role for which they have been nominated, *see id.* § 3345(b)(1); and, in any event, the Gaynor Order did not and could not cure the defects in Wolf's unlawful assumption of the role of Acting Secretary.

137.    The County, its employees, and its residents, and Local 521 and its members have been harmed and continue to be harmed by these unlawful acts.

### THIRD CLAIM FOR RELIEF

### Violation of the Appointments Clause, U.S. Const., art. II, § 2, cl. 2

138.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Amended Complaint.

139.    Under the Appointments Clause of the U.S. Constitution, the President "shall

nominate, and by and with Advice and Consent of the Senate, shall appoint . . . Officers, of the United States."  U.S. Const., art. II, § 2, cl. 2.  As a limited exception, Congress may authorize the President, a court of law, or "Heads of Departments" to appoint inferior officers without the advice and consent of the Senate.  *Id.*

140.    The Department of Homeland Security is an Executive Department.  5 U.S.C. § 101.  As a Head of Department, the Secretary of Homeland Security is a principal officer subject to the Appointments Clause.  *See Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1657 (2020).

141.    An inferior officer may perform the functions of a vacant principal office but only "for a limited time, and under special and *temporary* conditions."  *United States v. Eaton*, 169 U.S. 331, 338 (1898) (emphasis added).  In other words, the Appointments Clause does not tolerate an acting official or acting officials serving for an unreasonably long period of time in a vacant position that requires Senate confirmation.

142.    Defendant Wolf has not been confirmed by the Senate for the position of Secretary of Homeland Security.

143.    When he appointed Defendant Edlow to the office of Deputy Director for Policy of USCIS on February 19, 2020, Defendant Wolf had not been nominated by the President or confirmed by the Senate for the position of Secretary of Homeland Security.  By February 19, 2020, the office of the Secretary had been vacant for 315 days.

144.    When he issued his Memorandum on July 28, 2020, Defendant Wolf had not been nominated by the President or confirmed by the Senate for the position of Secretary of Homeland Security.  By July 28, 2020, the office of the Secretary had been vacant for 475 days.

145.    Even if Defendant Wolf's service as Acting Secretary of Homeland Security were consistent with the HSA and FVRA, his unreasonably long service in that role would violate the Appointments Clause.

146.    In addition, Defendant Wolf's appointment as Acting Secretary by another inferior officer violates the Appointments Clause.

147.    Under the Appointments Clause, a "Head of Department" is a principal officer who

may be authorized to appoint inferior officers.  But an acting official is an inferior officer, not principal officer.  *Eaton*, 169 U.S. at 338.  Thus, although an acting secretary performs the functions or duties of the secretary of a department, that acting secretary is not a "Head of Department" and cannot appoint another inferior officer.  To allow otherwise would permit acting secretaries to appoint their replacements seriatim, avoiding indefinitely the strictures of the Appointments Clause.

148.    When Commissioner McAleenan amended DHS's order of succession, he was an inferior officer purportedly serving as Acting Secretary.  Because Commissioner McAleenan was not a Head of Department within the meaning of the Appointments Clause, he did not have authority to amend DHS's order of succession and thus appoint another inferior officer to serve in an acting capacity.  Therefore, even if McAleenan had lawfully served as Acting Secretary, Defendant Wolf could not have properly assumed the role of Acting Secretary based on Commissioner McAleenan's amendments.

149.    Because Defendant Wolf was not serving legally as the Acting Secretary of Homeland Security, he did not have legal authority to issue the Wolf Memorandum or to appoint Defendant Edlow to serve as Deputy Director of Policy of USCIS.

150.    Because they were issued by officials without the authority to do so, the Wolf Memorandum and Edlow Directive are invalid and must be vacated.

151.    The County, its employees, and its residents, and Local 521 and its members have been harmed and continue to be harmed by these unlawful acts.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

A.    Vacate and set aside the Wolf Memorandum and Edlow Directive;

B.    Declare that the Wolf Memorandum and Edlow Directive and Defendants' actions in connection therewith were issued in violation of the Homeland Security Act and the Federal Vacancies Reform Act and are void and without legal force or effect;

C.    Declare that the Wolf Memorandum and Edlow Directive were issued in violation of the Appointments Clause of the U.S. Constitution;

D.    Declare that the Wolf Memorandum and Edlow Directive and Defendants' actions in

AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

connection therewith are arbitrary, capricious, an abuse of discretion, and otherwise not in

accordance with law required by law in violation of 5 U.S.C. §§ 702–06;

E.     Preliminarily and permanently enjoin and restrain Defendants, their agents, servants,

employees, attorneys, and all persons in active concert or participation with any of them, from

implementing or enforcing the Wolf Memorandum and Edlow Directive or from taking any other

action to rescind DACA that is not in compliance with applicable law;

F.     Grant Plaintiffs further relief as necessary to remedy the injuries caused by the

unlawful actions taken by Defendants, including by allowing those individuals who would have been

eligible to apply for deferred action under DACA were it not for the unlawful rescission in 2017 to

apply for DACA now;

G.     Award Plaintiffs reasonable attorneys' fees and costs; and

H.     Grant Plaintiffs such further and additional relief as the Court deems just and proper.

Dated:  November 2, 2020                    Respectfully submitted,

/s/ James R. Williams
JAMES R. WILLIAMS, County Counsel
GRETA S. HANSEN
LAURA S. TRICE
MARCELO QUIÑONES
HANNAH KIESCHNICK
OFFICE OF THE COUNTY COUNSEL
70 West Hedding Street
East Wing, Ninth Floor
San José, California 95110
Telephone: (408) 299-5900
Facsimile: (408) 292-7240
laura.trice@cco.sccgov.org
marcelo.quinones@cco.sccgov.org
hannah.kieschnick@cco.sccgov.org

*Attorneys for Plaintiff County of Santa Clara*

/s/ Stacey M. Leyton
STACEY M. LEYTON
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
sleyton@altber.com

*Attorney for all Plaintiffs*